THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v SANTIAGO DEPAULA, Respondent.

At approximately 10:20 P.M. on November 28, 1988, two uniformed police officers were on routine patrol in a marked police car when they received a radio call of a crime in progress, reporting that shots had been fired in apartment 5-J at 31 Post Avenue in the Inwood section of Manhattan, which was further described in the message as a drug location. The officers arrived at the building within two minutes and proceeded directly to apartment 5-J, encountering on the way a woman on the stairs between the fourth and fifth floors, who informed them she had been visiting a friend on the fifth floor. Upon their arrival at the door of apartment 5-J, the officers, with guns drawn, knocked on the door. Defendant opened the door holding both hands wrapped around the door. Upon seeing the police officers with guns drawn, his eyes opened wide and he quickly moved to close the door. One of the officers stuck his foot in the door and told defendant they were the police and wanted to enter the apartment because they had received a radio transmission of shots being fired inside the apartment. When defendant shook his head and kept saying "No, no", the officers backed defendant away from the door at gunpoint and told him to turn around, put his hands on the wall and not move. After a patdown frisk revealed no weapon on defendant, one of the officers, with gun at the ready, walked cautiously down the hallway in order to determine whether there were any other persons in the apartment who were armed or had been shot. Upon looking into the doorway of the first room he reached, a bedroom, the officer observed a stack of United States currency, several bags of white powder and crack vials on top of the dresser and a silver revolver on a nightstand next to the bed. Defendant was then placed under arrest after which he stated several times that he lived in the apartment, but "didn't know where the drugs and stuff came from."

In granting suppression, Criminal Term found that the People had failed to clear the first hurdle of establishing the

propriety of the police entry into defendant's apartment under the "emergency" doctrine enunciated in *People v Mitchell* (39 NY2d 173, 177), *viz.,* the right inherent in the very nature of their duties as peace officers, of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest.

In articulating some guidelines for the application of the "emergency" doctrine, the court (per Gabrielli, J.), summarized the basic elements of the exception in the following manner:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

"(2) The search must not be primarily motivated by intent to arrest and seize evidence.

"(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched" (39 NY2d, *supra,* at 177-178).

While crediting the testifying officer's testimony in full and accepting as true the bona fides of his subjective belief that an emergency may have been at hand in apartment 5-J, the hearing court, nevertheless, found that the police did not have a "valid reason" to believe an emergency existed to justify their warrantless entry into the apartment. In so ruling, the court noted several times that its decision was dictated by our holding in *People v Lawrence* (145 AD2d 375, *appeal dismissed* 74 NY2d 732).

We disagree and find that the court's application of *Lawrence (supra)* to this case is inapposite and its decision seems to overlook the very nature of the emergency exception to the warrant requirement.

In *People v Lawrence (supra),* a radio run reported shots fired on the fourth floor of a particular "narcotics prone" building. Defendant, who had been standing on the stoop, turned and ran inside the building when he saw the police drive up. The police pursued him with guns drawn and frisked him when they caught up with him, finding a pistol. As this court found, there was not "an 'inherently dangerous situation' " which warranted the police action *(supra,* at 376). Rather, since the police had only an unconfirmed anonymous report of shots fired in the building and the defendant was outside, there was "no reasonable basis for the police to believe that defendant was involved in the commission of a crime". *(People v Lawrence, supra,* at 377.) Simply put, in

*Lawrence,* there was no demonstrable connection between the anonymous call and defendant and, thus, the traditional analysis of a "stop and frisk" was applied.

Here, however, the police responded within two minutes to a call of a crime in progress—"shots fired"—which directed them to a specific destination. After knocking on the door of 5-J, they explained their presence to defendant, who opened the door. Their apprehension that he or someone inside might be armed or that someone was hurt was heightened by the manner in which he refused them entry, *i.e.,* holding onto the door, keeping himself partially shielded by it, appearing nervous at their presence and attempting to close the door on them. Fearing for themselves as well as for anyone inside, the officers were justified in pushing open the door and frisking defendant once inside.

The nature and specificity of the call, the speed with which the officers responded (thereby increasing the chances that the danger still existed) and their reception by defendant, together constituted a valid basis for an objective belief that an emergency situation existed. While these factors may not be susceptible to the general probable cause analysis, they need not meet that standard under the emergency doctrine rationale. In fact, if they did have to meet such a test, there would be no purpose for the emergency exception. The hearing court's conclusion that the police had at most a right to inquire at the door and nothing more ignores the distinction between exigent circumstances and the usual stop and frisk, as well as the rationale for the emergency exception. *(See, People v Mitchell, supra; People v Krom,* 61 NY2d 187, 198.)

While under normal circumstances the police failure to attempt to find corroboration or otherwise investigate, cited by the hearing court, would be relevant, where the police receive a call of shots fired, as a crime in progress, in a specific apartment in a known drug location, any delay caused by such investigation could plainly result in further injury or other serious consequences. In recognizing the danger of delayed response, the law does not require adherence to a standard which "made stricter by hindsight" would preclude the police from "all courses of conduct but the least intrusive." *(People v Calhoun,* 49 NY2d 398, 403.) Indeed, it is difficult to conceive of what other action, consistent with their belief that someone inside might be injured or threatened, could have been taken to provide immediate assistance.

Finally, the officer's testimony, which was credited in its

entirety by the hearing court, clearly established that the actions taken inside the apartment were not primarily motivated by the desire to make an arrest and seize evidence, but by an intent to ascertain if anyone was injured. Moreover, there was a reasonable basis to connect the emergency with the area searched since the call specified that particular apartment.

Accordingly, since the circumstances satisfy all three requirements articulated in *People v Mitchell (supra)*, defendant's suppression motion should have been denied. Concur— Ellerin, J. P., Wallach, Kupferman and Ross, JJ.