■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JERRY LOVE, Appellant. [610 NYS2d 958] —Judgment, Supreme Court, New York County (Charles Tejada, J.), rendered May 26, 1992, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree, and sentencing him, as a second felony offender, to a term of 5 to 10 years is affirmed.

The evidence at the suppression hearing was that two police officers, on uniform foot patrol, immediately responded to a

radio transmission of "a man with a gun" in a specified room at a named hotel. With guns drawn, they knocked on the designated hotel room door. A woman opened the door about 15 inches, and when she tried to slam the door shut, the officers pushed it open. Upon entry into the 8 feet by 8 feet room, the officers saw what appeared to be an automatic handgun on the floor, and in open view on a table, drugs and drug paraphernalia. Defendant was on the bed.

We agree with the hearing court that the requirements of the emergency doctrine were satisfied, justifying the officers' warrantless entry into the room, and the resulting denial of defendant's motion to suppress the contraband (see, People v Mitchell, 39 NY2d 173, 177-178, cert denied 426 US 953). Contrary to the conclusion reached by the dissent, this case is not appreciably different from People v DePaula (179 AD2d 424). In People v DePaula (supra, at 426), it was stated that the "nature and specificity of the call, the speed with which the officers responded (thereby increasing the chances that the danger still existed) and their reception by defendant, together constituted a valid basis for an objective belief that an emergency situation existed". While the report in this case was of a "man with a gun" as opposed to the report of " 'shots fired' " received in DePaula (supra, at 426) all of the other factors were the same. The dissent notes that in DePaula (supra, at 426), it was stated that "where the police receive a call of shots fired, as a crime in progress * * * any delay caused by [an attempt to find corroboration or other] investigation could plainly result in further injury or other serious consequences". There was clearly the same possibility for serious consequences if the responding officers in this case allowed the door to be closed and did not enter. The dissent's reference to a matter in Boston where the police entered the wrong apartment is totally inappropriate. The dissent blithely ignores the fact that here the police entered the correct apartment.

Viewing the evidence in the light most favorable to the People and giving them the benefit of every reasonable inference (People v Malizia, 62 NY2d 755, cert denied 469 US 932), we find that the evidence, which included defendant's close proximity to drugs and drug paraphernalia used in the manufacture and packaging of crack/cocaine, was sufficient as a matter of law to support a finding that defendant knowingly possessed at least one-half ounce of cocaine (see, People v Ryan, 82 NY2d 497, 505). Moreover, upon an independent review of the facts, we find that the verdict was not against

the weight of the evidence *(see, People v Bleakley,* 69 NY2d 490).

Contrary to defendant's contention, the trial court's decision to allow the first six sworn jurors to leave the courtroom for the day while voir dire of the remaining prospective jurors proceeded was not per se reversible error *(People v Cassado,* 156 AD2d 183, *lv denied* 75 NY2d 917). Both defendant and his attorney were present when the court excused the jurors but did not object, and, in any event, there being no showing of any real prejudice, the error, if any, was harmless *(supra).*

We have considered defendant's remaining arguments, including the assertion that he was denied a fair trial by the court's *Sandoval* ruling, and find them to be without merit. Concur—Sullivan, J. P., Wallach, Kupferman and Ross, JJ.

Carro, J., dissents in a memorandum as follows: At 12:17 A.M. on May 22, 1991, while on uniformed foot patrol on 42nd Street and Eighth Avenue, Officers Thomas Kelly and Donald Graves received a radio transmission reporting a man with a gun on the roof of 300 West 44th Street, a nearby hotel known for drug and prostitution activity. Before the officers arrived at the hotel, another radio transmission advised that the report was unfounded. Thirteen minutes after the first call was received, Kelly and Graves received a second transmission reporting a man with a gun inside room 314 of the same building.

The officers went to the room, drew their guns, and knocked on the door. A woman subsequently identified as Sonya Cook opened the door about 15 inches, looked at Kelly, and tried to "slam" the door shut. Kelly pushed the door open to "make sure [he] wasn't in any danger of being shot." As the door opened, Cook stepped back, and Kelly saw what appeared to be a black metal handgun, which turned out to be an imitation pistol, on the floor near her feet. Both officers entered the room; Kelly handcuffed Cook, and Graves observed the defendant on the bed, apparently sleeping. The officers pointed their guns at him and ordered him to show his hands, which he did. On a table a few feet from the bed the officers saw drugs and drug paraphernalia, which defendant sought to suppress at a *Mapp* hearing, as the fruits of an unlawful entry into the hotel room. I believe that the motion should have been granted.

The hearing court found that the forcible and warrantless police entry into the hotel room did not violate the Fourth Amendment because it was triggered by an emergency situa-

tion reasonably perceived by the officers, and was not motivated by the intent to apprehend and arrest the defendant. Basic elements of the "emergency" exception to the warrant requirement were set forth in *People v Mitchell* (39 NY2d 173, 177-178, *cert denied* 426 US 953) as follows:

"(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

"(2) The search must not be primarily motivated by intent to arrest and seize evidence.

"(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."

Examination of the testimony at the *Mapp* hearing in light of the *Mitchell* criteria, and fact patterns of other cases applying the emergency doctrine, points to a determination that the police entry into the hotel room was unconstitutional. In *People v DePaula* (179 AD2d 424, 426), which the hearing court found controlling, the police responded to a report of " 'shots fired' " in a particular apartment. In finding permissible the forcible police entry in that case, we noted that "where the police receive a call of shots fired, as a crime in progress, in a specific apartment in a known drug location, any delay caused by [an attempt to find corroboration or other] investigation could plainly result in further injury or other serious consequences." *(Supra,* at 426.) We further observed that "the actions taken inside the apartment were not primarily motivated by the desire to make an arrest and seize evidence, but by an intent to ascertain if anyone was injured" *(People v DePaula,* 179 AD2d, *supra,* at 427). Unlike the police in *Mitchell (supra)* and *DePaula (supra),* who expressed their intent to aid an imperiled citizen, Officer Kelly denied any concern for the woman in room 314; her safety "didn't enter my mind at that moment, no."

Other cases applying the emergency doctrine shed light on the emphasis placed upon the police intention to prevent injury to persons or property, e.g., *People v Kane* (175 AD2d 881 [report of explosives in apartment]); *People v Diaz* (170 AD2d 618, *lv denied* 79 NY2d 855 [report of kidnapped child in apartment]); *People v Isaac* (194 AD2d 690, *lv denied* 82 NY2d 720 [report of hysterical screams coming from apartment; hysterical and bruised female standing behind defendant who opened door]); *People v Wilson* (191 AD2d 528 [sounds of gunshots in apartment]); *People v Rivera* (171 AD2d

560, *lv denied* 78 NY2d 973 [report of male shot in apartment; screaming and scuffling heard in apartment]); *People v Del Guidicesol* (166 AD2d 183, *lv denied* 77 NY2d 960 [report of shots fired in apartment; sounds of glass breaking and objects falling heard inside]).

The majority apparently finds no difference, for purposes of applying the emergency doctrine, between a radio report of " 'shots fired,' " as in *People v DePaula (supra,* at 426), and a report of a "man with a gun" as in the instant case; and finds "the same possibility for serious consequences" as in the *DePaula* case, if the officers here had not forced the door open and entered the room. As previously noted, the officers in this case were not concerned with the safety of Sonya Cook, and I am not clear as to what other "serious consequences" of an emergency nature the majority has in mind. While the possession of a weapon in a room or home is not a trifling matter, I would hope that the majority is not suggesting that the police may force doors and forcibly enter premises without a warrant whenever they have an anonymous tip that someone within the premises has a gun. Yet the majority does seem to be applying that very principle, or one close to it, which as far as I know is without precedent. I acknowledge that there is some ambiguity in a report of a "man with a gun"—that is, it may signify that the man has a gun near him, e.g. on a table, or in a holster or waistband, which would not constitute an emergency; or it may signify that the man is waving the gun and possibly threatening someone, which would constitute an emergency. In this case, the attendant circumstances did not suggest an emergency, as the possession of the gun was reported to be in a private place, and there was no evidence that Sonya Cook, who answered the door, was being threatened or needed assistance.

There is a significant difference, for search and seizure purposes, between a report that a person possesses a gun, and a report that a person has fired a gun or used it for the commission of a crime *(see, People v Green,* 35 NY2d 193, 196). The People are unable to cite any case authority applying the emergency doctrine to justify a forcible, nighttime entry into an apartment or hotel room where the asserted basis for such entry is an anonymous report of a man with a gun. This Court has recognized that a search under such circumstances constitutes "a most intrusive entry," and that "[s]ince a nighttime entry more seriously intrudes on protected privacy interests than a daytime entry, the People face an even heavier burden in demonstrating the reasonableness of the police action than

they would otherwise" *(People v Cruz,* 149 AD2d 151, 160). I believe the People have not met this heavier burden.

It is a sad coincidence that as this dissent was being prepared, a tragic event took place in Boston—one which vividly illustrates the source of my dismay that the emergency doctrine is being drastically extended by the majority into dangerous territory, and without just cause. The event, reported in the New York Times on March 28, 1994 (at 1, col 4), reads as follows:

*"Minister Who Sought Peace Dies in a Botched Drug Raid*

"The Rev. Accelynne Williams who for decades had comforted and counseled people throughout the Caribbean, retired to Boston six years ago to be near his daughter and to study the Scriptures. On Friday a police SWAT team searching for drugs broke down his apartment door without warning and handcuffed him. Minutes later, the 75-year old minister was dead of heart failure.

"The police, it turned out, had misread a floor plan provided by an informer; they had intended to raid an apartment on the floor above Mr. Williams. * * *

"The Boston Globe today quoted an unidentified law enforcement official who said that the police had chased Mr. Williams through his apartment and had broken down a bedroom door to reach him. According to the Globe, the official said that as Mr. Williams was being handcuffed he became so frightened that he began vomiting and collapsed."

In the instant case Jerry Love was awakened after midnight by two police officers pointing their guns at him and ordering him to show his hands, immediately after his female companion was thrown to the floor and handcuffed. Love did not literally die of fright upon having his peace so violently interrupted by the police, as did the Rev. Williams, but he could have, and hardly a soul would know or care. Under the holding of this case, every woman and man may now legally be subjected to a violent intrusion into home or hotel room in the middle of the night merely by dint of an anonymous "911" call, either genuine or fabricated. The record at the suppression hearing points strongly toward the conclusion that the officers here entered the hotel room as part of their law enforcement function, as there was no indication of a genuine pending emergency requiring their immediate forcible entry "for the protection of life or property" *(People v Mitchell,* 39 NY2d, *supra,* at 177).

In *Wong Sun v United States* (371 US 471, 479) Justice

Brennan trenchantly observed that "[t]he history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice.' *Brinegar* v. *United States,* 338 U.S. 160, 176." In this country, the right of privacy has always been deemed "too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted." *(McDonald v United States,* 335 US 451, 455-456.) Perhaps the most eloquent· articulation of the principle that we as Judges should seek to protect and vindicate here, is attributed to William Pitt, Earl of Chatham, when he addressed the House of Commons in March 1763, as quoted in *Miller v United States* (357 US 301, 307): " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' "

This means that Jerry Love's right of privacy in his fleabag hotel room is entitled to the same respect and vindication as the right of privacy enjoyed by any other citizen of this State. In our zeal to punish those who possess drugs we must not let the end justify the means. Rather, as Justice Brandeis observed in one of his more famous dissents: "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *(Olmstead v United States,* 277 US 438, 479.) Today, we permit the police to forcibly enter Jerry Love's hotel room under the guise of an "emergency" generated by an anonymous tip. Tomorrow, it might be a Rev. Williams, or any one of us. I cannot conceive that this is right. Thus I dissent.