[928 NE2d 1027, 902 NYS2d 830]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NORMAN McBRIDE, Appellant.

Argued March 23, 2010; decided April 29, 2010

**POINTS OF COUNSEL**

*Fried, Frank, Harris, Shriver & Jacobson LLP,* New York City (*Joshua Roth, Peter Simmons* and *Jennifer Colyer* of counsel),

and *Office of the Appellate Defender* (*Richard M. Greenberg* and *Daniel A. Warshawsky* of counsel) for appellant. I. Because the police went to Mr. McBride's apartment with the intent to arrest him but without a warrant, the subsequent arrest of Mr. McBride was unlawful, and the prosecution could not rely on the "emergency exception" to the warrant requirement to justify the warrantless arrest of Mr. McBride. (*People v Adams*, 53 NY2d 1; *People v Mitchell*, 39 NY2d 173; *People v Coles*, 62 NY2d 908; *Brigham City v Stuart*, 547 US 398; *People v Molnar*, 98 NY2d 328; *United States v Barone*, 330 F2d 543, 377 US 1004; *People v Dillon*, 44 AD3d 1068; *People v Harris*, 77 NY2d 434; *People v Torres*, 74 NY2d 224; *People v Gokey*, 60 NY2d 309.) II. Because any exigent circumstances that may have existed were created by the police, the warrantless entry into Mr. McBride's apartment was unlawful, and the statements and physical items that were the products of that unlawful entry should have been suppressed. (*People v Leonti*, 18 NY2d 384; *People v Levan*, 62 NY2d 139; *People v Bero*, 139 AD2d 581; *People v Lott*, 102 AD2d 506.) III. The lineup that produced Mr. McBride's identification was unduly suggestive because Mr. McBride was the only person displayed in the lineup wearing a gray hooded sweatshirt that precisely matched the eyewitnesses' description of the clothing worn by the perpetrator. (*People v Adams*, 53 NY2d 241; *People v Chipp*, 75 NY2d 327; *Foster v California*, 394 US 440; *People v Owens*, 74 NY2d 677; *People v Riddick*, 251 AD2d 517; *People v Bady*, 202 AD2d 440; *People v Davis*, 169 AD2d 508; *People v Velez*, 169 AD2d 661; *People v Sapp*, 98 AD2d 784; *People v Johnson*, 79 AD2d 617.)

*Robert M. Morgenthau, District Attorney*, New York City (*Dana Poole* and *Alan Gadlin* of counsel), for respondent. I. The lower courts' determinations that exigent circumstances justified the police officers' warrantless entry into defendant's apartment are fully supported by the record. (*Payton v New York*, 445 US 573; *People v Mitchell*, 39 NY2d 173, 426 US 953; *People v Levan*, 62 NY2d 139; *People v Molnar*, 98 NY2d 328; *United States v Knights*, 534 US 112; *United States v Reed*, 572 F2d 412; *Dorman v United States*, 435 F2d 385; *People v Cruz*, 149 AD2d 151; *People v Kilgore*, 21 AD3d 1257; *People v Mason*, 248 AD2d 751.) II. The lineup was not rendered suggestive simply because defendant wore a gray sweatshirt. (*People v Santos*, 250 AD2d 413, 92 NY2d 905, 525 US 1076; *People v Adams*, 53 NY2d 241; *People v Jackson*, 98 NY2d 555; *People v Chipp*, 75 NY2d 327, 498 US 833; *People v Amuso*, 39 AD3d 425; *People v Grant*, 43 AD3d 800; *People v Owens*, 74 NY2d 677; *People v Johnson*, 79

AD2d 617; *People v Bady,* 202 AD2d 440; *People v Sapp,* 98 AD2d 784.)

### OPINION OF THE COURT

CIPARICK, J.

The primary issue presented by this appeal is whether defendant's constitutional right to be free from an unlawful search and seizure was violated when the police entered his home without a warrant. We conclude that there is evidence in the record to support the determination that exigent circumstances justified the warrantless entry.

A grand jury indicted defendant for first degree robbery (Penal Law § 160.15 [4]), second degree robbery (Penal Law § 160.10 [1]), and other related charges stemming from an incident that occurred on March 21, 2004 at a Manhattan restaurant. Before trial, defendant pleaded guilty to attempted second degree robbery (Penal Law §§ 110.00, 160.10 [1]). Prior to defendant's guilty plea, Supreme Court conducted a pretrial hearing to determine whether the police unlawfully arrested defendant and seized physical evidence in his home, whether defendant's lineup was unduly suggestive, and whether the statements taken from defendant by the police violated defendant's *Miranda* rights. Supreme Court denied defendant's suppression motion in its entirety. The Appellate Division affirmed the judgment of conviction and sentence (59 AD3d 151 [1st Dept 2009]). A Judge of this Court granted defendant leave to appeal (12 NY3d 917 [2009]) and we now affirm.

There was evidence adduced at the hearing that, on March 22, 2004, Detective Shaska of the New York City Police Department went to a Cosi restaurant located on West 42nd Street in Manhattan to investigate a gunpoint robbery that occurred there the day before. Detective Shaska interviewed a number of the employees present at the time of the robbery including Elizam Mangual. Mangual told the detective that he first saw defendant and two other men come into the restaurant that afternoon, but that they had stayed only for a short period of time. Within the hour, however, Mangual noticed that the three men had returned. Defendant walked up to Mangual and told him that he had been a breadmaker at the restaurant. Moments later, Mangual saw defendant brandish a gun and direct the restaurant manager to the area where the safe is kept. Soon afterward, defendant and the two other men fled. Although Mangual did not see defendant take the money, defendant, in a

written statement given to the police after his arrest, admitted to stealing money from the safe.

Detective Shaska also testified that Mangual provided her with a detailed physical description of defendant and told her that he was wearing a black waist-length flight jacket, a gray hooded sweatshirt, a black skull cap, dark blue jeans and was carrying gray construction gloves with circles when he committed the robbery. Detective Shaska requested a list of former employees of the restaurant from the district manager to develop a possible suspect. The district manager provided that list to her and defendant's name appeared on it. Detective Shaska determined that defendant had a criminal record and obtained his photograph from police files. She then placed this photograph into a photo array that also contained five photographs of other men who looked similar to defendant. Detective Shaska showed this photo array to Mangual and he identified defendant as the gunman.

Following Mangual's identification of defendant, Detective Shaska learned that defendant was on parole. When Detective Shaska returned to work on March 25, 2004, she contacted defendant's parole officer who provided her with defendant's address. At approximately 11:00 P.M. that evening, Detective Shaska and four other police officers went to defendant's apartment. As the police officers approached defendant's front door, they could hear voices coming from inside the apartment. The police officers knocked on the door for a few minutes and identified themselves, but no one answered. One of the police officers used the building intercom system to call defendant's apartment and a person the police officer believed to be male answered. While three of the police officers remained outside of defendant's front door, Detective Shaska and one of her partners went to the apartment directly below defendant's in order to access the fire escape outside his apartment. From the fire escape, Detective Shaska peered through a window into defendant's apartment and saw a man lying on the floor. Guns drawn, Detective Shaska or her partner knocked on the window and stated, "Police department. Open up the door." A short time thereafter, Detective Shaska observed a different person run towards the door.

Detective Santeufemia, one of the police officers who remained at defendant's door, testified that eventually a young woman, later known to the police as Lenora Mitchell, answered the door. She was crying and it also appeared to him that she was having

difficulty breathing and was hyperventilating. Detective Santeufemia tried to calm her down and asked her, "Are you okay? Is everything all right?" Mitchell was unresponsive to his questions. Her appearance and inability to speak caused Detective Santeufemia to believe that she was facing a life-threatening situation. On this basis, he decided to enter defendant's apartment to investigate. When he entered, he saw defendant standing in the hallway and handcuffed him.

Mitchell, a close friend of defendant, testified at the hearing for the defense. She explained that she was watching television with defendant and the lights in the apartment were off when they heard the police knocking at the front door. Defendant instructed her not to answer the door and they ignored the police officers' repeated requests. Mitchell then became aware that there were police officers on the fire escape and she heard them say that they were going to enter the apartment through the window. Although it was dark inside the apartment, Mitchell testified that she saw one of the police officers on the fire escape point a gun at her face. She opened the front door and started to cry. Mitchell explained that the police officers calmed her down and assured her that everything was going to be all right.

The police then transported defendant to the station house and advised him of his *Miranda* rights. Defendant waived his rights and gave a statement admitting his involvement in the gunpoint robbery. Later, he was placed in a lineup and identified by three out of four witnesses.

■ We begin our analysis by looking at the federal and state constitutional proscriptions prohibiting the police from engaging in unlawful searches and seizures. It is axiomatic that warrantless entries into a home to make an arrest are " 'presumptively unreasonable' " (*People v Molnar*, 98 NY2d 328, 331 [2002], quoting *Payton v New York*, 445 US 573, 586 [1980]). Nevertheless, "[c]ourts have long recognized that the Fourth Amendment is not violated every time police enter a private premises without a warrant" (*Molnar*, 98 NY2d at 331). Indeed, provided that there is probable cause, the police may proceed without a warrant to effectuate an arrest within a home if exigent circumstances exist to justify a warrantless entry (*see Kirk v Louisiana*, 536 US 635, 638 [2002]; *see also People v Burr*, 70 NY2d 354, 360 [1987]).

In determining whether exigent circumstances are present, both the federal and state courts have applied a number of different factors. These factors include

> "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry" (*United States v Martinez-Gonzalez*, 686 F2d 93, 100 [2d Cir 1982] [internal quotation marks and citations omitted]; *see also United States v Reed*, 572 F2d 412, 424 [2d Cir 1978]; *People v Cloud*, 168 AD2d 91, 92-94 [1st Dept 1991], *affd* 79 NY2d 786 [1991]).

We agree that these factors will appropriately assist a suppression court in its analysis of whether exigent circumstances are present, but are mindful that this list is illustrative and "not to be viewed as definitive or exhaustive" (*Cloud*, 168 AD2d at 94). Indeed, the ultimate inquiry a suppression court must make is "whether in light of all the facts of the particular case there was an urgent need that justifies a warrantless entry" (*Martinez-Gonzalez*, 686 F2d at 100 [internal quotation marks, parentheses and citations omitted]).

In this case, both Supreme Court and the Appellate Division concluded that exigent circumstances justified the warrantless entry by the police into defendant's home. On appeal, we note that defendant does not dispute the fact that the police had probable cause to arrest him for armed robbery, a violent crime. We also note that there is record support for the findings below that the police had strong reason to believe that defendant was inside his apartment and that they only entered defendant's apartment after Mitchell opened the door and they observed that she was crying, hyperventilating, and unresponsive to their questions. These affirmed findings, having support in the record, preclude this Court's further review (*see People v Brown*, 95 NY2d 942, 943 [2000]; *People v Hallman*, 92 NY2d 840, 842 [1998]).

Defendant argues, on the other hand, that it was the conduct of the police officers when they arrived at defendant's home that created the exigency. Defendant maintains that it was the

police who frightened Mitchell out of defendant's apartment and caused her to appear distressed. To be sure, we have held that "the police themselves cannot by their own conduct create an appearance of exigency" (*People v Levan*, 62 NY2d 139, 146 [1984]). The courts below, however, rejected defendant's assertion, and their finding on this factual issue, also having support in the record, is likewise beyond our further review (*see Brown*, 95 NY2d at 943; *cf. Levan*, 62 NY2d at 143 [no exigent circumstances where defendant simply opened the door for his neighbor and the police "with guns drawn, bypassed the woman, entered the apartment and arrested defendant inside"]).*

However, in affirming the order of the Appellate Division, we are not unmindful of the fact that the police could have obtained an arrest warrant for defendant from a neutral magistrate before it dispatched five members from its force to defendant's home. Indeed, three days passed from the time the police identified defendant as the gunman to the time they went to his home to arrest him. Although we acknowledge that there was nothing illegal about the police going to defendant's apartment and requesting that he voluntarily come out (*see People v Minley*, 68 NY2d 952, 953 [1986]) and conclude that exigent circumstances in this case ultimately justified the warrantless entry, we recognize that it would have been more prudent if the police obtained a warrant for defendant's arrest before going to his home.

Since exigent circumstances justified the warrantless entry into defendant's home and his subsequent arrest, the seizure of the articles of clothing from defendant's home that were in plain view and that matched the description provided by Mangual was proper. We also conclude that Supreme Court properly denied defendant's motion to suppress his statements. There was evidence in the record to support that court's determination that defendant voluntarily and knowingly waived his *Miranda* rights and agreed to be interviewed by the police.

■ Defendant's final contention that the lineup was unduly suggestive because he was the only person wearing a gray hooded sweatshirt, an article of clothing which was part of a detailed clothing description provided to Detective Shaska by Mangual, is without merit. A lineup is nonsuggestive when the

---

* In holding that exigent circumstances justified the warrantless entry into defendant's home, we need not determine if the police formed the subjective intent to arrest defendant at his home (*see People v Mitchell*, 39 NY2d 173, 177-178 [1976]). In any event, since defendant never raised the "primary motivation" argument in Supreme Court, it is unpreserved for our review.

participants resemble each other so that the defendant is not "singled out for identification" (*People v Chipp*, 75 NY2d 327, 336 [1990]). The question whether a lineup is unduly suggestive is a mixed question of law and fact (*see People v Jackson*, 98 NY2d 555, 559 [2002]). If there is record support for the determinations of the lower courts that a lineup is not unduly suggestive, that issue is beyond this Court's review (*see id.*).

Here, defendant and the five fillers were all African-American males who were of similar age and skin tones. They all had short hair and close-cropped beards. The men in the lineup were seated, mitigating any differences in height. Defendant's sole issue with the lineup is the fact that he was wearing a gray hooded sweatshirt. Of course, where a suspect is the only one in a lineup wearing the same "distinctive clothing" as described by a witness to the crime, a lineup is unduly suggestive as a matter of law (*People v Owens*, 74 NY2d 677, 678 [1989]). In contrast, where the clothing described by the witness and then worn by the defendant at the lineup is "not unusual," it is not considered suggestive (*People v Gilbert*, 295 AD2d 275, 277 [1st Dept 2002], *lv denied* 99 NY2d 558 [2002]; *cf. Owens*, 74 NY2d at 678 [defendant "conspicuously displayed" in lineup where he was the only person wearing "a tan vest and a blue snorkel jacket—which fit the description of the clothing allegedly worn by the perpetrator of the crime"]). Here, Supreme Court viewed a photograph of the lineup and noted that defendant and all the fillers were wearing nondescript street clothing and the gray hooded sweatshirt worn by defendant was a "generic and common article of clothing." Moreover, since the sweatshirt was only one of the many items of clothing described by the witness, Supreme Court concluded that although defendant happened to be wearing the same type of sweatshirt in the lineup, it did not make the lineup unduly suggestive. Therefore, since the affirmed findings by the Appellate Division that the lineup was not unduly suggestive are amply supported by the record, this issue is likewise beyond our further review (*see Jackson*, 98 NY2d at 559).

Accordingly, the order of the Appellate Division should be affirmed.

PIGOTT, J. (dissenting). What is clear from the record is that the police had several days to get an arrest warrant for the defendant and inexplicably failed to do so; and "exigency" does not cure that failure. It is for that reason that I respectfully dissent.

The day after the robbery, an employee of the restaurant provided a detailed description of defendant, a former employee, and he later identified defendant from a photo array. This provided sufficient probable cause to obtain a warrant for defendant's arrest. Rather than immediately following up on this information or obtaining the warrant, however, no action was taken for the next three days. The police then obtained defendant's address from his parole officer and, rather than applying for an arrest warrant at that time, five officers went to defendant's apartment at 11 o'clock at night and began banging on the door.

According to one detective, she and another officer positioned themselves on the fire escape outside defendant's apartment, weapons drawn, flashlights shining, and began knocking on the window, demanding that the occupants open the door. When Lenora Mitchell went to the door and opened it, she was visibly shaken. Because Mitchell was unable to answer the officers' questions immediately, they entered the apartment "to see if there was some kind of life threatening situation."

In *Payton v New York*, the United States Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest" (445 US 573, 576 [1980]). One exception to that rule—the exigent circumstances exception—permits a warrantless entry into a suspect's home "where certain urgent events occur that do not provide the police with sufficient time to obtain an arrest warrant" (Kamins, New York Search & Seizure § 3.04 [2] [b] [ii], at 3-32 [2009], citing *People v Knapp*, 52 NY2d 689 [1981]).

The majority concludes that there is record support for the conclusion by the lower courts that exigent circumstances justified the warrantless entry, pointing to the "record . . . findings" that "the police had strong reason to believe that defendant was inside his apartment and that they only entered [it] after Mitchell opened the door" and the police observed her condition (majority op at 446). In the majority's view, this somehow justified their conduct. However, the real issue is "could the police, as required by the Fourth Amendment and legions of cases, have obtained a warrant prior to going to defendant's apartment when they clearly intended to effect an arrest?" In my view, they could have, and should have, and because there was certainly no record support for the conclusion that the police were faced with an exigency other than that which they created, the warrantless entry constituted a clear *Payton* violation.

In making a determination as to whether circumstances exist justifying a warrantless arrest of a defendant in his home, the courts may consider the gravity of the crime, the defendant's possession of and willingness to use a weapon, and the likelihood of an escape attempt (*see e.g. People v Mealer*, 57 NY2d 214, 219 [1982], *cert denied* 460 US 1024 [1983]). Other factors courts may consider include whether there is a reliable basis to believe that the defendant is on the premises, whether there is probable cause to believe that the defendant committed the crime, and the time of day of the police entry and whether the entry was peaceful in nature (Kamins, New York Search & Seizure § 3.04 [2] [b] [ii], at 3-33—3-34; *see Dorman v United States*, 435 F2d 385 [DC Cir 1970]). But cases addressing the issue of the warrantless arrest of a defendant in his home are in the context of the necessity for prompt action by the police such as found in *Mealer* and *Dorman* (*see People v Hill*, 70 AD3d 1487 [4th Dept 2010] [warrantless entry justified by exigent circumstances where victim, whose head was bleeding, was found near the crime scene, and police had reason to believe defendant was inside apartment with claw hammer]; *People v Garcia*, 27 AD3d 307 [1st Dept 2006], *lv denied* 6 NY3d 894 [2006] [warrantless entry proper where police were responding to a violent dispute and saw from a common hallway a man inside apartment with a gun]; *People v Mason*, 248 AD2d 751 [3d Dept 1998] [exigent circumstances present where police arrived at the scene shortly after the incident and suspected that the defendant committed a burglary]; *People Jones*, 134 AD2d 451 [2d Dept 1987], *lv denied* 70 NY2d 1007 [1988] [warrantless entry justified by exigent circumstances where police were led to the scene within minutes of the crime, where defendant had committed the violent offenses of sodomy and sexual abuse at gunpoint]).

It is only if one blindly applies the *Mealer/Dorman* factors without first considering facts leading up to the eventual arrest—that the police had probable cause to arrest defendant and at least three days to get a warrant—that one could conclude that the suppression court and the Appellate Division properly upheld the warrantless entry into defendant's home. There is no evidence that the police faced circumstances where they had to act quickly to arrest defendant (*see People v Bloom*, 241 AD2d 975 [4th Dept 1997], *lv denied* 90 NY2d 938 [1997] [record did not support suppression court's determination that exigent circumstances justified the failure of the police to obtain a warrant where the police were not in pursuit of defendant,

the robbery had occurred 21 hours earlier and there was no indication that defendant was aware of the police presence and therefore was not likely to escape or destroy evidence]; *People v Vennor*, 176 AD2d 1217 [4th Dept 1991]; *People v Martinez*, 160 AD2d 351 [1st Dept 1990]). Nor was there testimony by the officers that it would have been burdensome for them to obtain a warrant (*see People v Ramos*, 206 AD2d 260 [1st Dept 1994] [People failed to establish that the warrantless entry by police officers was justified where there was no evidence that officers were in pursuit of a fleeing felon or that defendant was likely to destroy the money he had received or the drugs he had been selling, nor was there any testimony that it would have been burdensome for the officers to obtain a warrant]).

Defendant makes the further argument, citing *People v Levan* (62 NY2d 139 [1984]), that the police may not create the exigency. Whether or not the police created such an exigency is a question of fact to be determined by the suppression court; and here the record evidence seems clear that any exigency was the result of police conduct.

As to the post-arrest statements, I note that the Appellate Division found no need to address the issue of whether they were sufficiently attenuated from the illegal entry in the apartment, primarily because the Appellate Division concluded that the warrantless entry was proper. Therefore, this matter should be remanded to the Appellate Division to address defendant's post-arrest statements and whether they were sufficiently attenuated from the warrantless entry.

Judges GRAFFEO, READ and SMITH concur with Judge CIPAR-ICK; Judge PIGOTT dissents in a separate opinion in which Judge JONES concurs; Chief Judge LIPPMAN taking no part.

Order affirmed.