OPINION OF THE COURT
John T. Hecht, J.
In this case, the People sought an order compelling defendant to submit to a DNA swab to determine if his DNA was on a weapon, a Taurus 9 millimeter handgun, which the police allege they saw him toss from the window of his residence. I held a decision on the swab order in abeyance pending a suppression hearing, for if the gun had been seized in violation of defendant’s privacy rights, then the swab order would not issue. The hearing was conducted, and I ordered defendant to submit to *345 the DNA swab because I determined that the police had acted lawfully when they seized the gun. This decision explains why.
Four witnesses testified at the Payton/Mapp hearing (see Payton v New York, 445 US 573 [1980]; Mapp v Ohio, 367 US 643 [1961]). The prosecution proffered Police Officers Robert Mayer and Stephen Berardi, and defendant his mother and Rosemarie Jackson, an investigator employed by defendant’s attorney, the Legal Aid Society. The testimony of all four witnesses was truthful. Further, there was no conflict — certainly no substantial conflict — between the versions of the day’s events to which each witness testified. Importantly, defendant’s mother’s testimony correlated with that of Officer Berardi with regard to their encounter inside defendant’s home.
My findings of fact are as follows.
On November 10, 2011, at approximately 12:25 p.m., Officer Mayer and his fellow officers, all in plain clothes, went to the vicinity of 612 Jerome Street, Brooklyn, as a result of a tip provided by a confidential informant that someone possessed a gun there. The address pertained to a two-story residential building that was attached on one side to other two-story buildings and surrounded by a yard on the other side and in the back.
The police did not seek a search warrant because their informant, out of fear, did not wish to go to the courthouse to swear out a warrant. As a result, the officers’ sergeant decided that his team would investigate the tip by seeking consent to search the house from its occupants.
Officer Mayer’s role in this endeavor was to station himself, secretly and prophylactically, within view of the rear of the house while the other officers approached the house from the front. He maintained contact with his team via a police radio. To access a view of the rear of the house, Officer Mayer entered a driveway on Livonia Avenue that led to the backyard of 612 Jerome Street. The driveway, which was part of a parking lot, was open to the public. Officer Mayer positioned himself at the corner of, and outside, a fence that enclosed the backyard of 612 Jerome Street. Although the backyard was overgrown with vegetation, Officer Mayer’s vantage point permitted him to see the windows on the ground floor of the house, through the fence, which was not solid.
At some point, Officer Mayer observed defendant appear at a back window of the house. Defendant ripped a plastic cover off the window, threw a black bag from inside the house to the *346 ground outside and dropped what appeared to be a silver, or silver and black, firearm onto or into the bag. Officer Mayer was 20 feet away at the time and had an unobstructed view of these actions.
When he made his observations, Officer Mayer communicated to his team, “Frankie just came out the window,” which was his coded way of referring to a gun. His team responded an acknowledgment by radio. Subsequently, they informed Officer Mayer that the location was secure. He then jumped over the fence, retrieved the gun that had been thrown out the window and entered the house through the window. No physical evidence was recovered from inside. Officer Mayer conceded that none of the residents had given police permission to enter the yard.
Officer Berardi’s testimony described what else occurred when Officer Mayer was at the back of the house. Officer Berardi and a sergeant knocked on the front door, which a woman, who identified herself as the mother of the household, opened. The officers explained that they believed that there was a firearm in the house. Defendant’s mother invited them in. While they were in the vestibule, the officers received the above-described radio transmission from Officer Mayer to the effect that a gun had come out the window. The sergeant acknowledged the transmission and told Officer Berardi to check the house for occupants. An individual, described as irate, emerged from a room in the back of the house and told the officers to get out of his house. After a struggle, the officers succeeded in placing him under arrest. Officer Mayer identified that individual to Officer Berardi as the person he saw throw the gun out the window. He is the defendant. The officers also arrested another individual who was asleep in the bedroom from which the gun had been tossed.
Defendant’s mother testified consistently with Officer Berardi. According to her, on the day in question she was living at 612 Jerome Street with defendant and two other family members. The police knocked on the door of her house. When she responded, she learned that the officers had been told that someone kept a gun in the house. She invited the officers into the hall. She told the officers that her son (defendant) and a friend were asleep in his room, knocked on their door and told them to get up.
While the officers were inside her house, defendant’s mother heard on the police radio that someone had thrown a gun out a window. The officers then pushed her aside, ran towards the *347 back of the house and grabbed defendant, who had come out of his room. Additional officers came into the house. Defendant’s mother testified that the officers said that they had found a gun in the backyard.
The final witness, Rosemarie Jackson, testified that she went to the rear of 612 Jerome Street on September 21, 2012, to take pictures and make observations of the backyard. Although vegetation blocked her view of the subject window, her observations were made more than 10 months after the day in question and at a different time of year. Thus, although I credit her testimony, I do not find it to conflict with Officer Mayer’s that he was able to see the window from behind the yard on November 10, 2011.
The Fourth Amendment to the United States Constitution protects the integrity of an individual’s house and the private area surrounding the house, known as its “curtilage.” As the Supreme Court recently explained in United States v Jones (565 US —, —, 132 S Ct 945, 949-950 [2012]), “[t]he text of the Fourth Amendment reflects its close connection to property .... Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass . . . [and] was understood to embody a particular concern for government trespass upon the areas (‘persons, houses, papers, and effects’) it enumerates.” This case raises, initially, the question whether the Fourth Amendment affords protection to defendant’s backyard and, if so, whether Officer Mayer violated the Fourth Amendment when he jumped over the fence to enter defendant’s backyard to retrieve the gun.
The Supreme Court has identified four factors that help resolve whether an area outside the house is within its curtilage: its proximity to the house, whether it is within an enclosure that surrounds the house, the nature of the uses to which it is put, and the steps that the resident takes to protect the area from observation (United States v Dunn, 480 US 294 [1987]). Here, the backyard was immediately next to the house and extended only approximately 20 feet beyond its rear. It was enclosed within a perimeter fence. There was no testimony as to the uses to which the backyard was put other than what can be inferred from the fact that it was overgrown with vegetation, i.e., it was neglected. As to the final factor — steps taken by the resident to protect the yard from observation — the yard was enclosed by a fence through which people could see, yet it was allowed to overgrow. Together, these factors suggest that, although it was neglected and visible to outsiders, the resident intended *348 that the backyard be treated as part of the house itself. Because I conclude that the backyard lay within the house’s curtilage, it was “under the home’s ‘umbrella’ of Fourth Amendment protection” (United States v Dunn, 480 US at 300-301; People v Abruzzi, 52 AD2d 499 [2d Dept 1976], affd 42 NY2d 813 [1977]). This conclusion is, not coincidentally, consistent with New York’s statutory definition of trespass, which would apply to Officer Mayer’s unlicensed entry into defendant’s backyard (see Penal Law §§ 140.05 [“A person is guilty of trespass when he knowingly enters . . . unlawfully in or upon premises”] and 140.00 [defining “premises” to include real property and “enter(ing) . . . unlawfully” to include an unlicenced entry]).
Accordingly, although Officer Mayer made his observations from a publicly accessible area beyond the defendant’s house and its curtilage (People v Alberti, 111 AD2d 860 [2d Dept 1985], Iv denied 66 NY2d 760 [1985] [officer located upon public right-of-way was entitled to observe what was exposed to public]), his jumping over the fence that surrounded defendant’s property and his entry onto defendant’s yard constituted a trespass onto a constitutionally protected area (see People v Abruzzi, 52 AD2d 499 [1976] [officer’s observations from defendant’s rear yard without a warrant or exigent circumstances unlawful]).
Not every warrantless intrusion onto property is, however, unconstitutional. Although a warrantless search of an individual’s house is per se unreasonable and presumptively unconstitutional (see Schneckloth v Bustamonte, 412 US 218, 219 [1973]; People v Hodge, 44 NY2d 553, 557 [1978]), the People may rebut the presumption when they present facts that establish an exception to the warrant requirement (Vale v Louisiana, 399 US 30, 34 [1970]; People v Pettinato, 69 NY2d 653, 654 [1986]; People v Calhoun, 49 NY2d 398, 402 [1980]). The burden of proving the exception to the search warrant requirement is strictly on the People; that burden is even greater when the police had an opportunity to obtain a warrant (People v Knapp, 52 NY2d 689, 694 [1981]; People v Mojica-Sanchez, 90 AD3d 488, 489 [1st Dept 2011], Iv denied 18 NY3d 960 [2012]).
One exception to the warrant requirement applies “when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable” (Kentucky v King, 563 US —, —, 131 S Ct 1849, 1856 [2011] [internal quotation marks omitted], quoting Mincey v Arizona, 437 US 385, 394 [1978]). “[A] warrantless intrusion may be justified by the risk of danger to the police or to other *349 persons inside or outside the dwelling” (Minnesota v Olson, 495 US 91, 100 [1990] [internal quotation marks omitted]).
Various formulations have been used to describe when such exigent circumstances are present. For example, the Court of Appeals synthesized the following factors:
“(1) the gravity or violent nature of the offense . . . ; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . ; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry” (People v McBride, 14 NY3d 440, 446 [2010] [citations omitted]).
The Second Department has suggested that the following factors be addressed:
“(1) the degree of urgency involved and the amount of time necessary to obtain a warranty] (2) [a] reasonable belief that the contraband is about to be removed!;] (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought!;] (4) information indicating the possessors of the contraband are aware that the police are on their trail!;] (5) the ready destructibility of the contraband . . . .” (People v Seaberry, 138 AD2d 422, 422-423 [2d Dept 1988], Iv denied 72 NY2d 866 [1988].)
“[T]he ultimate inquiry a suppression court must make is whether in light of all the facts of the particular case there was an urgent need that justifies a warrantless entry” (People v McBride, 14 NY3d 440, 446 [2010] [internal quotation marks and citation omitted]). For that reason, the above circumstances are illustrative and not exhaustive. But several of these factors are particularly applicable here, including the issues of urgency, gravity of the offense, probable cause, peaceable entry, and whether the defendant and individuals, aware of the presence of the police, might remove the contraband or harm the police officers or others. A consideration of these factors favors a finding of exigency.
First, because the gun was potentially a lethal weapon, if Officer Mayer did not immediately secure it, the risk that it might be used to harm the police officers or someone else was significant. Importantly, Officer Mayer did not simply suspect that a gun was on the premises. He saw one (cf. People v Doerbecker, *350 39 NY2d 448, 452 [1976] [exigent circumstances existed where police believed package secreted behind garage contained weapon]; People v Leach, 90 AD3d 1073 [2d Dept 2011], Iv granted 19 NY3d 975 [2012] [exigent circumstances permitted warrantless entry into apartment across street from shooting to locate gun and alleged shooters]).
Second, the occupants had ample reason to know that the police were on the premises and wanted to search it for a gun. The officers knocked on the front door, announced their presence and informed defendant’s mother — and, ostensibly, defendant too, whose mother awakened him when the officers told her why they had come — that they believed a gun was there. Officer Mayer was situated at the back of the house in case, as indeed happened, a firearm were to be secreted in response to the officers’ arrival. Defendant’s actions — that is, his tossing the gun out the window and his belligerent confrontation with the officers when he ordered them out of the house into which his mother had invited them — demonstrated that he, if not also other occupants, was intent on preventing the police from retrieving the gun. From Officer Mayer’s testimony that he entered the house through the window, I infer that individuals inside defendant’s residence, such as his mother, who was not arrested, or other people who lived there in addition to defendant and his mother might have been able to access the gun if it had not been secured. In addition, defendant’s house was attached on one side to other two-story residences and surrounded by a fence over which Officer Mayer was able to leap and through which he had been able to see the gun. Individuals in adjoining houses or in the publicly accessible area behind the house might therefore also have been able to reach the gun if the police had not immediately secured it. Thus, the risk that the gun might be removed or used to harm the police officers or others was concrete.
Third, Officer Mayer’s observations gave him probable cause to search defendant’s yard for the gun and for the police to arrest defendant for its possession (see People v Church, 217 AD2d 444, 445 [1st Dept 1995] [police observation of drug paraphernalia inside apartment while officers were lawfully on outdoor fire escape, and ensuing search of room and security check of premises did not violate defendant’s Fourth Amendment rights]).
Finally, and significantly, Officer Mayer entered defendant’s yard, and not his house, to secure the gun. His action was *351 therefore less intrusive than an uninvited, warrantless entry into the house would have been. Officer Mayer accessed the yard by merely jumping over a fence short enough to permit such access. He used no force. He caused no damage. He entered the yard in midday, not the middle of the night. (See People v Doerbecker, 39 NY2d 448, 452 [1976] [police entry into property behind garage, and not garage or other building, “was lesser rather than greater” intrusion]; see also People v Funches, 89 NY2d 1005 [1997] [defendant had a diminished expectation of privacy in the fire escape outside his window, in part because he made no effort to maintain any privacy in that area, and police had probable cause to enter defendant’s apartment once they discovered a loaded handgun on the fire escape and observed in plain view, through the open uncurtained window, what appeared to be contraband]; cf. United States v Simmons, 661 F3d 151, 157 [2d Cir 2011] [Fourth Amendment protections “apply with particular intensity when a home is searched in the middle of the night”].)
To the extent that the Fourth Amendment is concerned with reasonableness, Officer Mayer’s limited intrusion onto defendant’s outdoor and largely unsecured and publicly visible property to safeguard a gun was objectively reasonable. “Courts have long recognized that the Fourth Amendment is not violated every time police enter a private premises without a warrant. . . . ‘[T]he touchstone of the Fourth Amendment is reasonableness’ — not the warrant requirement” (People v Molnar, 98 NY2d 328, 331 [2002]; People v Rodriguez, 77 AD3d 280, 283 [2d Dept 2010], Iv denied 15 NY3d 955 [2010]; see also United States v Schmidt, 700 F3d 934 [7th Cir, Nov. 6, 2012] [exigent circumstances arising from shooting justified warrantless entry into backyard in which firearm had been secreted]; cf. People v Rossi, 99 AD3d 947 [2d Dept, Oct. 17, 2012] [search of backyard for gun upheld under emergency exception to warrant requirement]).
Despite this conclusion, I make the following observations. The People neglected to provide any evidence of the time that it would have taken the police to obtain a warrant. Nor did the People make a specific record of the efforts it would have cost the police to “impound” or secure the house pending a warrant. These deficits in the People’s proof are troubling, because they suggest a lack of sensitivity towards, if not a misunderstanding of, the significant constitutional issue that arises when the police enter a protected area without a warrant.
*352 Nonetheless, there was testimony, however scant, that supports a finding that the exigencies of the situation would have made it unreasonable for the police to have waited any time at all to secure a warrant. Because, as noted, individuals other than defendant both inside and outside the house might have been able to access the backyard, the police needed to safeguard the gun immediately.
For these same reasons, I conclude that impounding the house would not have been feasible or constitutionally required. Three cases illustrate why. In People v Clements, rather than impound an apartment, the police seized a dresser inside it and opened a drawer to locate contraband. As the Court of Appeals reasoned,
“As a practical matter the police would have had to take possession of defendant’s apartment, including surely all means of ingress and egress. Any person entering or leaving the apartment would have had to have been at least stopped and probably then restrained. Control of the areas adjoining the dresser would have had to have been assured. In sum this proposal would have entailed a much greater intrusion in both space and time than that to which the defendant ] [was] actually subjected” (People v Clements, 37 NY2d 675, 681 [1975], cert denied sub nom. Metzger v New York, 425 US 911 [1976]).
In United States v Simmons, in contrast, where the police had effectively impounded an apartment and secured its inhabitants, their failure to seek a warrant to enter an isolated room to retrieve a gun to which no one had access was unreasonable (United States v Simmons, 661 F3d 151 [2d Cir 2011]). Similarly, in People v Knapp, the police should have secured a warrant, rather than conduct a search, “after they had assured themselves of complete control of [defendant’s] house and its occupants” (People v Knapp, 52 NY2d 689, 693 [1981] [emphasis added]; see also People v Harper, 100 AD3d 772 [2d Dept, Nov. 14, 2012] [exigent circumstances did not apply to warrantless entry into defendant’s apartment where altercation had ended, injured complainants had been identified, alleged assailants had been apprehended and there was no reason to believe another victim was inside apartment]).
Here, as in Clements, by entering the backyard to seize the gun, the police effected less of an intrusion than they would have had to make had they impounded defendant’s house and yard. Officer Mayer went directly to the specific spot where he *353 had seen the gun. He did not rummage through defendant’s property. The gun, unlike the one in Simmons, which was isolated in a secured indoor room, or the contraband in Knapp, also in isolated areas of a house over which the police had “complete control,” was in an outdoor yard potentially accessible to others in circumstances where the officers’ presence was known, or could easily be known, to people both inside and outside the house. I do not conceive how the police could have secured defendant’s yard without entering his or an adjacent neighbor’s property, or even how any such entry would have fully safeguarded the gun without the police’s seizing it (see United States v Martino, 664 F2d 860 [2d Cir 1981] [finding that exigent circumstances justified entry into yard to seize heroin]). Accordingly, impounding the house and yard would not have been feasible, would have been an unnecessarily greater imposition on defendant’s (and others’) rights than jumping over the fence and, therefore, was not required by the Constitution in this case.
Finally, I note that the police did not create the exigency that occurred when they observed defendant toss what appeared to be a firearm from a window of the house (cf. People v McBride, 14 NY3d 440, 446 [2010]). They simply knocked on the door, explained the purpose of their visit and were invited in. When defendant’s mother told defendant to get up, probably thereby alerting him to the presence of police officers in their house, the police did not cause defendant to throw the gun out the window. He and not they created the exigency by doing so.
For these reasons, the motion to suppress was denied.