[907 NYS2d 294]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GEORGE RODRIGUEZ, Respondent.

Second Department, August 31, 2010

### APPEARANCES OF COUNSEL

*Richard A. Brown, District Attorney*, Kew Gardens (*Gary Fidel* and *Donna Aldea* of counsel), for appellant.

*Quadrino Schwartz*, Garden City (*Nathaniel E. Burney* of counsel), for respondent.

### OPINION OF THE COURT

CHAMBERS, J.

In this case, we conclude that the Supreme Court erred in suppressing physical evidence recovered from the defendant's apartment, as the police were presented with an emergency situation under the standards articulated in *Brigham City v Stuart* (547 US 398 [2006]) and *People v Mitchell* (39 NY2d 173 [1976], *cert denied* 426 US 953 [1976]).

### Facts

On August 4, 2006, Police Officer John Bellico and Sergeant Brian Hennessy responded to a radio call informing them of a stabbing in progress on the fifth floor of an apartment complex in Rockaway Beach. Bellico and Hennessy found the defendant, who was bleeding heavily from two large lacerations, on a fifth-floor stairwell of the apartment complex. The defendant provided a description of his assailant and, pursuant to police protocol, Bellico and other officers were dispatched to a nearby train station, where Bellico observed a suspect meeting that description. Hennessy remained at the scene and questioned the defendant about the attack. The defendant stated only that he was walking along the fifth floor when a man stopped him and stabbed him for no reason. Upon further questioning, the defendant said that he did not live in the building. The defendant was then taken downstairs by emergency services to a waiting ambulance. Hennessy, continuing his investigation, learned from

the fifth-floor tenant who called the 911 emergency telephone number that the defendant did in fact live in the building, which raised his suspicion. He knocked on the doors of other fifth-floor apartments, but received no further information. From the fifth-floor stairwell, Hennessy followed a trail of blood leading down to the fourth floor and then to the third floor. On the third floor, Hennessy observed blood on the landing, near the elevator, and in front of apartment 3L, which happened to be where the defendant was living. As he neared apartment 3L, he saw droplets of blood in front of the door, as well as blood on the door.[1] Hennessy knocked on the door, but received no response. Given his small stature, he did not think he would be able to break down the door, and knowing that it would take the emergency services unit approximately 30 minutes to respond, Hennessy asked the superintendent to unlock the door. By the time the superintendent arrived with the key, about 10 minutes later, Hennessy had learned from a radio transmission that a suspect had been apprehended and that the defendant had made a positive identification at a showup. The superintendent unlocked the door, and Hennessy, along with Bellico, who met Hennessy on the third floor, went inside apartment 3L to ascertain whether someone else had been stabbed. Blood was observed in the kitchen and in the living room, but no other victims were found. On the kitchen counter, the officers noticed a digital scale with what appeared to be powdered cocaine on top, and nearby on the floor, the officers found a hydroponic tank with as many as 12 pots containing marijuana plants inside. A few minutes after entering the apartment, both Hennessy and Bellico left. Pursuant to a search warrant later secured by Bellico, police officers made a complete search and seized a significant amount of marijuana and cocaine, along with drug paraphernalia, from apartment 3L.

The defendant moved to suppress the physical evidence obtained from his apartment. The People asserted that the police's initial warrantless entry into apartment 3L was justified under the emergency exception to the warrant requirement. The hearing court found that the People failed to satisfy their burden of demonstrating that the police had reasonable grounds to believe there was an emergency at hand requiring their immediate assistance for the protection of life or property, the first prong of the *Mitchell* standard (*see People v Mitchell*,

---

1. The blood trail and blood in front of apartmant 3L are documented in photographs later taken by the crime scene unit.

39 NY2d at 177-178). The hearing court ruled that because the People failed to satisfy the first prong of *Mitchell,* it "need not analyze any other element." Moreover, relying on the Court of Appeals decision in *People v Robinson* (97 NY2d 341 [2001]), the hearing court concluded that the Court of Appeals "would probably eliminate the subjective prong" of *Mitchell* and, therefore, for that reason as well, it need not engage in any further analysis. The People appeal.

## Analysis

Analysis begins with the fundamental principle that the Fourth Amendment to the United States Constitution and article I, § 12 of the New York Constitution "accord special protection to a person's expectation of privacy in his [or her] own home" (*People v Knapp,* 52 NY2d 689, 694 [1981]). However, "[c]ourts have long recognized that the Fourth Amendment is not violated every time police enter a private premises without a warrant. Indeed, though warrantless entries into a home are presumptively unreasonable, the touchstone of the Fourth Amendment is reasonableness—not the warrant requirement" (*People v Molnar,* 98 NY2d 328, 331 [2002] [internal quotation marks and citations omitted]; *see People v Knapp,* 52 NY2d at 694). Recognizing these principles, a number of carefully delineated exceptions to the warrant requirement have been crafted (*see People v Molnar,* 98 NY2d at 331; *People v Knapp,* 52 NY2d at 694). One such exception is the emergency doctrine (*see Brigham City v Stuart,* 547 US at 403; *People v Guins,* 165 AD2d 549, 552 [1991]).

In *People v Mitchell* (39 NY2d at 173, 177-178), the Court of Appeals formulated a three-prong test for determining whether the police are presented with an emergency situation that justifies a warrantless intrusion into a protected area:

> "(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
>
> "(2) The search must not be primarily motivated by intent to arrest and seize evidence.
>
> "(3) There must some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."

In 2006 the United States Supreme Court, in order to resolve differences among the state courts and the federal circuit courts

concerning the appropriate standard governing warrantless entry by law enforcement in an emergency situation, rejected the second prong of the *Mitchell* test, stating that an inquiry into "[t]he officer's subjective motivation is irrelevant" (*Brigham City v Stuart*, 547 US at 404). Thus, the Court concluded, because the officers' actions in entering the premises were objectively reasonable in that case, it did "not matter . . . even if their subjective motives could be so neatly unraveled . . . whether the officers entered [the house] to arrest respondents and gather evidence against them or to assist the injured and prevent further violence" (*id.* at 405). As a result of *Brigham City*, "an inquiry into the subjective motivations of the police is no longer necessary in determining whether the Fourth Amendment . . . has been violated" (*People v Desmarat*, 38 AD3d 913, 915 [2007]). Thus, the decision in *Brigham City* created a conflict between the Fourth Amendment and New York law. However, since we find that the police in this case were presented with an emergency under both the *Mitchell* test and the rule adopted by the United States Supreme Court in *Brigham City*, we need not reach the issue of whether the New York Constitution requires retention of the "subjective motivation" prong of the *Mitchell* test (*see People v Dallas*, 8 NY3d 890, 891 [2007]; *People v Dillon*, 44 AD3d 1068, 1070 [2007]; *see also Matter of Clara C. v William L.*, 96 NY2d 244, 251 [2001, Levine, J., concurring]).

Under the *Mitchell* test, the first and third prongs make two related objective inquiries. The first prong asks whether the police have reasonable grounds to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life or property. The third prong asks whether there is some reasonable basis, approximating probable cause, to associate that emergency with the area or place to be searched (*see People v Mitchell*, 39 NY2d at 177-178; *People v Desmarat*, 38 AD3d at 915).

Initially, "[a]lthough factual findings by a hearing court are not to be lightly disregarded, plainly unjustified or clearly erroneous findings are not to be accepted by an appellate court" (*People v Battle*, 301 AD2d 537 [2003] [internal quotation marks omitted]; *see People v Garafolo*, 44 AD2d 86, 88 [1974]). In its decision, the hearing court excluded from its factual findings Hennessy's testimony that he observed a blood trail on the fifth floor and blood on the third- and fourth-floor landings. This testimony was documented in photographs and corroborated in

part by both the defendant and a defense witness.[2] Where, as here, the trier of fact has incorrectly assessed the evidence, the Appellate Division has the power to make new findings of fact (*see People v O'Hare*, 73 AD3d 812 [2010]; *Matter of Robert D.*, 69 AD3d 714, 717 [2010]). Moreover, under the circumstances, the hearing court's decision to discredit much of the testimony of Hennessy and Bellico cannot be accepted.[3]

"Appraising a particular situation to determine whether exigent circumstances justified a warrantless intrusion into a protected area presents difficult problems of evaluation and judgment" (*People v Mitchell*, 39 NY2d at 177). For a reviewing court, the difficulty is that, detached from the tension and drama of the moment, it must engage in reflection and hindsight in balancing the exigencies of the situation against the rights of the accused (*id.*).

■ Critical to our determination, as the hearing court acknowledged, is that the defendant, after being stabbed, ran up to the fifth floor and, once the police arrived, was acting evasively as to whether he lived in the building (*see People v De-Paula*, 179 AD2d 424, 426 [1992] [where the police responded to a specific apartment based on a call informing them that shots were fired, their apprehension that the defendant, who answered the door, or another person, was armed, or that someone inside might be hurt, was heightened by the manner in which he refused them entry]; *see also Matter of Pablo C.*, 220 AD2d 235 [1995] [where the police responded to a call informing them that shots were fired and were directed to the respondent's apartment, who refused them entry, and a man fled from that apartment via the fire escape and was apprehended but refused to answer questions, the police's warrantless entry was justified by the emergency at hand]; *People v Carby*, 198 AD2d 366 [1993]

---

2. The defendant testified that following the stabbing he ran up to the fourth floor and banged on doors, and then went to the fifth floor where he did the same until a tenant opened her door and indicated she would call 911. The defendant then went back to his apartment on the third floor to retrieve his keys and identification before meeting the police on the fifth floor. The defendant indicated that he was bleeding profusely during this time. A defense witness stated that there was blood on the stairways and on the third, fourth, and fifth floors. He also stated that there was blood on the door of apartment 3L and on the doormat in front of the apartment.

3. The hearing court also insinuated that the police withheld obtaining emergency medical assistance for the defendant because he was not forthcoming in answering their questions. However, the defendant testified that before the police questioned him, they informed him that an ambulance was on the way.

[where the police responded to a call informing them of shots fired at the subject residence and, upon inquiry, the defendant denied hearing any gunshots, that "denial heightened the officers' suspicions"]).[4] Once Hennessy learned that the defendant did in fact live in the building, his suspicion, as he testified, obviously was raised. Up until that point, every indication led to the conclusion that the attack occurred on the fifth floor. The radio call directed Bellico and Hennessy to respond to the fifth floor, the defendant was found bleeding on the fifth-floor stairwell, the defendant told Hennessy that the attack occurred on the fifth floor, and the 911 call originated from a fifth-floor apartment. After Hennessy learned that the defendant lived in the building, he followed blood down to the third floor where he found blood in front of and on the door of apartment 3L (see People v Hodge, 44 NY2d 553 [1978]; People v Desmarat, 38 AD3d at 914; People v Herring, 179 AD2d 549 [1992]; People v Taper, 105 AD2d 813 [1984] [all cases involved a blood trail]; see also United States v Chipps, 410 F3d 438, 443 [2005] [officer could have reasonably believed that the trail of blood indicated that someone's life was in immediate danger]). He knocked on the door but received no response. These "specific and articulable facts" (State v Sanders, 8 Wash App 306, 310, 506 P2d 892, 895 [1973]), which include the police coming onto a scene where a person had just been violently stabbed, the defendant's attempt to conceal where the attack occurred by running to the fifth floor, the defendant's denial that he lived in the building, the blood trail leading to the third floor, and the significant amount of blood found on the door and in front of apartment 3L, support a finding that the police had a reasonable basis to believe there was an emergency at hand (see People v Mitchell, 39 NY2d at 178 [noting that the police's reasons for the belief that an emergency exists must be grounded in empirical facts rather than subjective feelings]; People v Hill, 12 Cal 3d 731, 755, 528 P2d 1, 19-20 [exigency justified warrantless entry into the premises; the police arrived at the premises after learning that one person had been shot and taken to the hospital, they observed blood stains both outside and, looking through the

---

4. As to the circumstances surrounding the stabbing itself, the defendant gave several differing accounts. In one version, the defendant stated that he was attacked from behind as he was about to open his apartment door. In another version, he stated that the stabbing actually occurred directly in front of the staircase door. At one point the defendant stated that he was stabbed and then his assailant ran off. At another point he said that there was a struggle in the hallway and then the assailant stabbed him a second time.

porch window, inside the home, and, when they knocked, they received no response; under the circumstances, it was reasonable for the officers to believe that the shooting may have resulted in other casualties in addition to the one reported to the police, and that an immediate entry was necessary to render aid to anyone in distress]; 3 LaFave, Search and Seizure § 6.6 [a] [4th ed] [commenting that the useful question is whether the officers would have been derelict in their duty had they acted otherwise]).

Emergencies are analytically distinct from other exigent circumstances (*see* 3 LaFave, Search and Seizure § 6.6 [a] n 6 [4th ed]). The Fourth Amendment is concerned with reasonable probabilities (*see Hill v California*, 401 US 797, 804 [1971]), and the emergency doctrine is not as exacting as general probable cause analysis (*see People v DePaula*, 179 AD2d at 426 [noting that the basis for the belief that an emergency existed does not have to meet the probable cause standard]). Indeed, our jurisprudence demonstrates that entry into a home is permissible without a warrant if law enforcement officers reasonably believe that emergency assistance is needed (*see People v Desmarat*, 38 AD3d at 915 ["objective facts observed by the police provided them with a reasonable basis to believe that an emergency was at hand, that other persons *may have been* at risk of injury, and that the emergency was associated with (a particular room)" (emphasis added)]; *People v Manning*, 301 AD2d 661, 663 [2003] ["facts were sufficient to support the detective's belief that there *might have been* an injured woman in the defendant's apartment" (emphasis added)]; *People v Longboat*, 278 AD2d 836 [2000] [holding that the hearing court, based on the officer's testimony, properly determined that the entry was justified by an emergency, "i.e., the perception that an injured person *might* be in the apartment" (emphasis added)]; *see also Michigan v Fisher*, 558 US —, —, 130 S Ct 546, 549 [2009] [concluding that it was objectively reasonable for the police officers, who observed the defendant throwing things inside his home, to believe that the defendant's projectiles *"might have"* a human target or that he would hurt himself; "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception" (emphasis added)]; *Brigham City v Stuart*, 547 US at 406 [concluding that "the officers had an objectively reasonable basis for believing both that the injured adult *might* need help and that the violence in the kitchen was just beginning" (emphasis added)]; *State v Linton,*

146 Ariz 184, 185, 704 P2d 825, 826 [1985] [concluding that "it was not unreasonable for the officers to believe that a helpless victim *might* be lying within the house" (emphasis added)]).

The defendant contends that because there was no report of a missing person, and no reason for the officers to believe that there were more than two people involved in the incident, both of whom had been accounted for just prior to the officers' entry into apartment 3L, there was no objective basis to believe that there was an emergency justifying entry into the apartment. We disagree. "While under normal circumstances the police failure to attempt to find corroboration or otherwise investigate . . . would be relevant . . . any delay caused by such investigation could plainly result in further injury or other serious consequences" (*People v DePaula*, 179 AD2d at 426; *see United States v Russell*, 436 F3d 1086, 1091 [2006] [declining to adopt a requirement that the police obtain independent verification or other information relating to the emergency before entering a home]). In this instance, there was no one else to provide corroboration, and little time within which to investigate further (*see People v Stevens*, 57 AD3d 1515, 1516 [2008] [in finding the emergency doctrine applicable, the Court noted that the police were unaware whether anyone other than the deceased victim had been shot or whether there were occupants in the house who otherwise might require protection or assistance]). By the time Hennessy reached apartment 3L, the defendant had been driven away by ambulance. The only facts Hennessy had regarding the incident came from the defendant, whom Hennessy suspected had lied to him based on the information he obtained from the tenant who called 911. Under these circumstances, Hennessy could not rely on what the defendant told him about the stabbing, particularly as to where it occurred (*see State v Linton*, 146 Ariz at 185, 704 P2d at 826 [given the circumstances, in which two men were covered in blood, there was broken furniture and glass, it would have been unreasonable to take their word that no one else in need of help was in the home]). The defendant never indicated how many people were stabbed, and, having been taken by ambulance, he was not there for Hennessy to ask any additional questions (*see United States v Russell*, 436 F3d at 1091 ["It is unreasonable to expect the police to piece together a perfectly coherent picture in the scant minutes they had to digest the constantly-updated and conflicting information"]). While both the defendant and his alleged assailant had been accounted for, based on the police's initial

impression that the attack occurred on the fifth floor, Hennessy did not expect to find blood anywhere but on the fifth floor. Further, since the defendant had told Hennessy that an unknown person had attacked him at random on the fifth floor, there was a reasonable basis for Hennessy to conclude that the blood on the third floor belonged to another victim, and that the victim was in apartment 3L (*see People v Stevens*, 57 AD3d at 1516; *United States v Leveringston*, 397 F3d 1112, 1117 [2005], *cert denied* 546 US 862 [2005] [noting that while blood on the defendant's shirt could have been his own, given the circumstances, a reasonably prudent officer also could infer a fair probability that another party was injured in the suite after some sort of struggle with the defendant]). Alternatively, mindful that the defendant may have lied about living in the building, Hennessy had a reasonable basis to conclude that the defendant was involved in the attack, possibly having injured someone himself, and was trying to distance himself from where the attack occurred.

The defendant also contends that the fact that Hennessy waited 10 minutes for the superintendent to open the door, rather than to break down the door himself, demonstrated that there was no emergency. However, an entry under the emergency doctrine does not have to be immediate in order to be constitutional (*see People v Molnar*, 98 NY2d at 334 [holding that there was still an emergency notwithstanding the passage of an hour between the time when the police arrived and their entry into the apartment]; *People v Manning*, 301 AD2d at 662 [noting the rejection of the contention that the failure to burst into an apartment indicates there is no true emergency]). Moreover, Hennessy testified that, given his small stature, he did not think he would be able to knock down the door, and that it was faster to call the superintendent than to wait for the emergency services unit to respond. Thus, contrary to the defendant's contention, in the context of this case, Hennessy entered the apartment in the most expeditious manner possible.

With respect to the third prong, Hennessy's observations of the blood trail leading to apartment 3L, the significant amount of blood on the door and its threshold, gave the police some reasonable basis, approximating probable cause, to associate the emergency with the inside of apartment 3L (*see People v Desmarat*, 38 AD3d at 915 [bloody drag marks leading from the deceased to a motel room gave the police a reasonable basis to associate the emergency with that room]; *People v Taper*, 105

AD2d at 813 [police, responding to a homicide, found a bloody trail leading from the body to the defendant's social club; evidence obtained from the social club was lawfully seized under the emergency exception]).

In ascertaining the subjective motivation of the police, which can often prove a difficult task (*see Whren v United States*, 517 US 806, 814 [1996], *cert denied* 522 US 1119 [1998]; *People v Robinson*, 97 NY2d at 350), a reviewing court must look not only to the police's stated reasons for the conduct they undertook, but also to the objective facts and circumstances surrounding that conduct (*see United States v Restrepo*, 966 F2d 964, 972 [1992], *cert denied* 506 US 1049 [1993] [stating that subjective intent is discerned through direct evidence, such as statements, but also may be inferred from the totality of facts and circumstances]; *see also Devenpeck v Alford*, 543 US 146, 154 [2004] [noting that subjective intent is always determined by objective means]; *United States v Magleby*, 241 F3d 1306, 1312 [2001], *cert denied* 547 US 1097 [2006] [stating that a factfinder may draw inferences of subjective intent from a defendant's objective acts]). In this case, Bellico and Hennessy testified that the reason they entered apartment 3L was to see if someone else had been stabbed. The objective facts and circumstances, a more reliable indicator of the officers' motivation, supports their stated reason for the entry. These objective facts and circumstances come from Hennessy's testimony. Bellico had run off to apprehend the alleged assailant and did not return until just prior to the entry. It was Hennessy then, having undertaken an investigation in Bellico's absence, who provided the key objective facts and circumstances which form the basis for discerning the subjective intent of the police, and Hennessy's testimony is supported by the physical evidence which is documented in photographs taken by the crime scene unit.[5] All of the objective facts Hennessy testified to, the initial indica-

---

5. The hearing court discredited "much of the testimony" of Bellico and Hennessy. The court's reason for discrediting Bellico was because he gave contradictory testimony as to whether he followed the blood trail down to apartment 3L. The officer initially testified that, after returning from apprehending the alleged perpetrator, he and Hennessy followed the blood trail from the fifth floor to the third floor. However, on cross-examination, Bellico corrected his testimony, stating that, upon his return, he went straight to the third floor where he met Hennessy. This misstatement, which Bellico corrected on his own volition, was attributable to the officer not being prepared to testify at the hearing about the search, which by then had occurred more than two years earlier, there being legitimate confusion over the scope of the hearing. Since, in the People's view, the scope of the hearing had been expanded by the

tions that the defendant had been randomly attacked on the fifth floor by an unknown person, the defendant's apparent lie about not living in the building, the blood trail leading down to the third floor, the blood on the door of apartment 3L, and its threshold, and the lack of a response when Hennessy knocked at the door, leading him to ask the superintendent to open the door (that being the only way to ascertain whether there was another victim inside), demonstrate that the police were not primarily motivated by an intent to arrest and seize evidence (*see People v DePaula*, 179 AD2d at 426 [noting that it was difficult to conceive of what action the police could have taken, other than forcibly entering the apartment in order to render immediate assistance, that was consistent with their belief that someone inside the apartment might be injured or threatened]).

Further, and significantly, nothing in the record compelled the conclusion that the police officers undertook their examination as a pretext for a criminal search (*see People v Calhoun*, 49 NY2d 398, 406 [1980]). The record before us is devoid of any evidence from which an officer might have suspected that the defendant was engaged in criminal activity unrelated to the altercation. Hennessy also candidly admitted that the blood he saw in the hallway and on the door could have been the defendant's (*see United States v Leveringston*, 397 F3d at 1117). However, the requirement of reasonable grounds to believe that an emergency existed must " 'be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences' " (*State v Boggess*, 115 Wis 2d 443, 451, 340 NW2d 516, 522 [1983], quoting *State v Kraimer*, 99 Wis 2d 306, 324, 298 NW2d 568, 577 [1980], *cert denied* 451 US 973 [1981], quoting 2 LaFave, Search and Seizure § 6.6 [a] [1970]).

We note that the police officers could reasonably have concluded that, had they left to apply for a search warrant

court, the People requested an adjournment in order to prepare their witnesses. They were denied that request. In any event, regardless of the misstatement Bellico made in his testimony, it was Hennessy who observed the blood trail and followed it down to apartment 3L. The only inconsistency in Hennessy's testimony cited by the hearing court related to Hennessy's testimony that there was a bloody hand print on the door of apartment 3L, which the hearing court was unable to discern in a photograph. This inconsistency was minor since, regardless of whether there was a hand print (the photograph was taken more than an hour after the attack), there was a significant amount of blood on the door of apartment 3L.

without first entering apartment 3L, they may have been derelict in their duty (*see State v Plant*, 236 Neb 317, 326, 461 NW2d 253, 263-264 [1990] [concluding that under the totality of the circumstances, had the police failed to enter the home to determine the well-being of children, they may have been derelict in their duty]). "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here" (*Michigan v Fisher*, 558 US at —, 130 S Ct at 549), for the police do not just fight crime but perform "varied public service roles," including protecting citizens from harm and rendering medical assistance to those already harmed (*see People v Molnar*, 98 NY2d at 333; *People v Carby*, 198 AD2d at 366-367; *United States v Quezada*, 448 F3d 1005, 1007 [2006]; 3 LaFave, Search and Seizure § 6.6, citing ABA Standards for Criminal Justice §§ 1-1.1, 1-2.2 [2d ed 1980]). Where the preservation of human life is concerned, it is paramount to the right of privacy (*see State v Carlson*, 548 NW2d 138, 141 [Iowa 1996]; *see also People v Molnar*, 98 NY2d at 331-332; *Wayne v United States*, 318 F2d 205, 212 [1963], *cert denied* 375 US 860 [1963]; *People v Gallegos*, 13 Cal App 3d 239, 243, 91 Cal Rptr 517, 519 [1970]).

Accordingly, the police were presented with an emergency situation, justifying their warrantless entry into the defendant's apartment. Therefore, the order is reversed, on the law and the facts, that branch of the defendant's omnibus motion which was to suppress physical evidence is denied, and the matter is remitted to the Supreme Court, Queens County, for further proceedings.

RIVERA, J.P., DICKERSON and HALL, JJ., concur.

Ordered that the order is reversed, on the law and the facts, that branch of the defendant's omnibus motion which was to suppress physical evidence is denied, and the matter is remitted to the Supreme Court, Queens County, for further proceedings.