■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN ROSSI, Appellant. [952 NYS2d 285]—

The defendant challenges the lawfulness of a search of the backyard of his house, where a police officer discovered a loaded firearm. At the suppression hearing, four police officers and two detectives testified concerning their respective actions at the defendant's house on July 11, 2009. The four officers responded at different times between 5:00 a.m. and 5:10 a.m., all within minutes of a 911 emergency telephone call concerning a male who had been shot at that location.

The first officer to arrive, Police Officer Robert Allen, spoke with the defendant's wife, who was still on the phone with the 911 operator in front of the house. She stated that her husband had shot himself in the hand and was inside the house; she did

not know where the gun was. Officer Allen further testified that he "understood" there were children in the house, but he did not indicate the source of that understanding. Officer Allen immediately went inside and found the defendant at the end of a hallway in a bedroom doorway. The defendant was bleeding profusely from a serious hand wound and was not entirely coherent.

Police Officer Ralph Swanson arrived in a separate vehicle immediately after Officer Allen and saw him running into the house. Officer Swanson ran inside, not stopping to speak with the defendant's wife. Officers Allen and Swanson, with their guns drawn, ordered the defendant to come toward them down the hallway into the living room, which was by the front door; the defendant complied. On the floor of the living room, Officer Swanson holstered his weapon and frisked the defendant, but did not find the gun. The officers asked what had happened, and the defendant said he had been on the couch when he accidentally shot himself. The two officers repeatedly asked where the gun was; the defendant stated he did not know and that he usually kept it in a drawer in his bedroom or a safe in the basement. The questioning continued as emergency medical technicians (hereinafter EMT) arrived and ministered to the defendant's injury. Officer Swanson testified that, at this point, he did not know if anyone was outside with the defendant's wife.

Police Officer Raymond Buttacavoli arrived when the defendant was being treated by the EMT; Officer Swanson was also with the defendant, but then walked away. Officer Buttacavoli questioned the defendant further and discovered a holster for a gun protruding from between two pillows of the couch. As he was questioning the defendant, Officer Buttacavoli was not sure where Officers Allen and Swanson had gone; there "were people scattered" through the house and he was aware that Officers Allen and Swanson were "checking the rest of the house."

At the time when Officer Buttacavoli was with the defendant and Officers Allen and Swanson were checking the house, Police Officer Nicholas Alvarado arrived and learned from Officer Buttacavoli that the weapon was still missing and there were three children in the house. Officer Alvarado testified that, since other officers were already checking the house, he went into the backyard, searched it, and found a black plastic bag containing a handgun on the ground beside a shed; he then secured the area.

While Officer Alvarado was in the backyard, three children were removed from the house. Officer Swanson testified that, after he determined that the defendant had no weapon, he left

the defendant with the EMT and removed everyone from the house. Three children were in bedrooms down the same hallway where the defendant had initially been found. The defendant's daughter, who was about 10 years old, was in her parents' bedroom, and the defendant's son and his friend, both of whom were about 15 or 16 years old, were in another bedroom. Officer Alvarado testified that he was "not sure exactly the time that [the children] were removed from the house," but he saw them sitting in a vehicle parked in the driveway when he "exited the backyard" after finding the handgun.

Detective Thomas Pollock testified that he arrived at the scene about two hours later, at approximately 7:15 a.m. Officer Swanson told him that the defendant had been transported to the hospital and that a gun was behind the shed in the backyard. Detective Pollack obtained a written consent from the defendant's wife to search the premises. Detective Lee Krill testified that he arrived at about 9:40 a.m., and he retrieved the gun from the backyard and other evidence from inside the premises.

Based on this record, we determine that the Supreme Court properly denied suppression of the handgun seized from the backyard. While the consent of the defendant's wife did not render the handgun admissible (see People v May, 52 AD3d 147, 152 [2008]; cf. Matter of Leroy M., 16 NY3d 243, 246-247 [2011], cert denied 565 US —, 132 S Ct 155 [2011]), the People met their burden of demonstrating the legality of the police conduct (see People v Berrios, 28 NY2d 361, 367 [1971]; People v Cole, 85 AD3d 1198 [2011]), pursuant to the emergency exception to the warrant requirement. "[Al]though warrantless entries into a home are 'presumptively unreasonable' " (People v Molnar, 98 NY2d 328, 331 [2002], quoting Payton v New York, 445 US 573, 586 [1980]), a warrantless search and seizure in a protected area may be lawful under some circumstances, pursuant to the emergency doctrine (see People v Mitchell, 39 NY2d 173, 177-178 [1976], cert denied 426 US 953 [1976]). The exception applies where the police (1) have "reasonable grounds to believe there is an emergency at hand and an immediate need for their assistance for the protection of life or property," (2) are "not . . . primarily motivated by intent to arrest and seize evidence," and (3) have a "reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched" (People v Mitchell, 39 NY2d at 177-178; see People v Stanislaus-Blache, 93 AD3d 740, 741-742 [2012]; People v Rodriguez, 77 AD3d 280, 283 [2010]).

The United States Supreme Court has held that the subjective intent of the police is not relevant to determining the

reasonableness of police conduct under the Fourth Amendment to the United States Constitution (*see Brigham City v Stuart,* 547 US 398, 403 [2006]). Consequently, the second prong of *Mitchell* is now relevant, if at all, only to claims raised under the New York State Constitution (*see* NY Const, art I, § 12). We need not determine in this case whether the second prong of *Mitchell* is still viable under the New York State Constitution (*see People v Stanislaus-Blache,* 93 AD3d at 742; *cf. People v Robinson,* 97 NY2d 341, 350 [2001]), because we conclude that the actions of the police officers were permissible under both *Brigham City* and *Mitchell* (*see People v Stanislaus-Blache,* 93 AD3d at 742).

Here, the police initially entered the house after they received a 911 call regarding a shooting and had confirmed that information with a person who was outside the house. Under these circumstances, the initial entry into the house was lawful (*see People v Stanislaus-Blache,* 93 AD3d at 741-742; *People v Rodriguez,* 77 AD3d at 288-289; *People v Desmarat,* 38 AD3d 913, 914-915 [2007]). Moreover, the additional information available to the officers who initially responded, including the defendant's incoherence and evasive answers about the location of the gun and the presence of children on the premises, established an ongoing emergency and danger to life, justifying the search for and seizure of the gun (*see People v Stanislaus-Blache,* 93 AD3d at 741-742; *People v Bower,* 27 AD3d 1122, 1124 [2006]; *People v Smith,* 302 AD2d 410 [2003]; *People v Parker,* 299 AD2d 859, 860 [2002]; *People v Adams,* 236 AD2d 293 [1997]). Further the officers' testimony established that the search was not primarily motivated by the intent to make an arrest or seize evidence, and that there was a reasonable basis, approximating probable cause, to associate the area searched with the emergency (*see People v Stanislaus-Blache,* 93 AD3d at 742; *People v Desmarat,* 38 AD3d at 915).

We do not agree with our dissenting colleagues that the emergency abated once the police frisked the defendant and knew that the children did not have the gun. The testimony established that, at the time Officer Alvarado decided to search the backyard, he was aware that other officers were searching the house, but he was not aware that the children were secure and out of danger. He testified that he was only inside the house "shortly" before he went outside, the children were removed from the house "shortly after," but he was not sure exactly of the time that they were removed, and he did not observe the manner in which the other officers "secured" the children. In context, therefore, his testimony that he perceived the children

to be in nightwear and that they did not have a gun related to his observation of them after he left the backyard. The lack of evidence pinpointing the exact moment the children were being removed relative to Officer Alvarado's search for the gun was not attributable to the People's failure to meet their burden, but rather, was explained by the fact that different officers were searching different parts of the premises simultaneously due to the emergency and, therefore, no one officer was in possession of all the facts. Under all the circumstances, we deem the officers' actions to have been " 'strictly circumscribed by the exigencies' " (*Mincey v Arizona*, 437 US 385, 393 [1978], quoting *Terry v Ohio*, 392 US 1, 26 [1968]), which included the defendant's evasive answers about the possible location of the gun, the rapidly unfolding events within a matter of a few minutes, the manifest objective of the officers to safeguard the residents, and the simultaneous search of different parts of the premises by different officers. Accordingly, the Supreme Court properly denied suppression of the handgun.

The defendant failed to preserve for appellate review his challenge to the legal sufficiency of the evidence (*see* CPL 470.05 [2]; *People v Goddard*, 72 AD3d 839, 839-840 [2010]). In any event, contrary to the defendant's contention, the People adduced evidence disproving, beyond a reasonable doubt, the defense of temporary lawful possession of a weapon (*see People v Sooknanan*, 92 AD3d 810 [2012]; *People v Sheehan*, 41 AD3d 335 [2007]; *see also People v Banks*, 76 NY2d 799 [1990]; *People v Hughes*, 289 AD2d 186 [2001]). Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

The defendant failed to preserve for appellate review his contention that the prosecutor committed misconduct in connection with certain opening remarks and certain direct examination questions (*see* CPL 470.05 [2]; *People v Paul*, 82 AD3d 1267 [2011]; *People v Salnave*, 41 AD3d 872, 874 [2007]). In any event, the isolated remarks and questions by the prosecutor were not so pervasive or flagrant as to deny the defendant a fair trial under the circumstances of this case (*see People v Almonte*, 23 AD3d 392, 394 [2005]; *People v Svanberg*, 293 AD2d 555 [2002]).

The record shows that defense counsel provided meaningful representation to the defendant, and, thus, he was not deprived of the effective assistance of counsel (*see People v Benevento*, 91 NY2d 708 [1998]; *People v Baldi*, 54 NY2d 137 [1981]). Skelos, J.P., Angiolillo and Belen, JJ., concur.

Chambers, J., dissents and votes to reverse the judgment, grant suppression of the physical evidence, and order a new trial with the following memorandum, in which Florio, J., concurs: I respectfully dissent. In my view, the People failed to meet the requirements of the emergency exception to the warrant requirement.

On July 11, 2009, at approximately 5:00 a.m., Nassau County Police Officer Robert Allen responded to a radio call of a man shot in the hand at the defendant's house. Outside the house, Officer Allen was met by the defendant's wife who, while still on the phone with the 911 operator, told him that the defendant had shot himself in the hand and was inside the house. Officer Allen, followed by Police Officer Ralph Swanson, entered the house and found the defendant at the end of a hallway bleeding from his hand. The defendant was ordered into the living room, frisked, and found to be unarmed. The defendant was questioned about the whereabouts of the gun, as Officer Allen knew that there were also three children in the house, but he gave varying answers as to the gun's location.

At 5:10 a.m., Police Officer Nicholas Alvarado arrived at the scene and was briefed about the situation. He was told that there was a missing gun and that it needed to be secured so that no one was injured by it. Since there were already officers inside the house, Officer Alvarado went outside to search for the weapon. By that time, Officer Alvarado testified, it was clear that the children, who were in nightwear, did not have the weapon on them. In the backyard of the house, near a shed, Officer Alvarado found a black plastic bag with a gun inside. Officer Alvarado did not know the location of the children when he began his search, but noted that by the time he exited the backyard, the children were outside the house, sitting in a vehicle parked in the driveway. Officer Swanson testified that he removed everyone from the house after he had determined that it was safe to do so, which was after he had questioned the defendant about the gun's whereabouts.

Under the emergency doctrine (*see People v Mitchell*, 39 NY2d 173 [1976], *cert denied* 426 US 953 [1976]), the police may make a warrantless intrusion into a protected area if three prerequisites are met: (1) the police must have reasonable grounds to believe that there is an emergency at hand and an immediate

need for their assistance for the protection of life or property; (2) the search must not be primarily motivated by intent to arrest and seize evidence; and (3) there must some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched (*see People v Mitchell*, 39 NY2d at 177-178). "This exception must be narrowly construed because it is susceptible of abuse and may be used to validate an otherwise unlawful arrest or seizure" (*People v Guins*, 165 AD2d 549, 552 [1991]; *see People v Gallmon*, 19 NY2d 389, 394 [1967], *cert denied* 390 US 911 [1968]).

In my view, the first and third prongs of the *Mitchell* standard were not satisfied. The scope and duration of a search must be limited by and reasonably related to the exigencies of the situation (*see Mincey v Arizona*, 437 US 385, 393 [1978] ["a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation' " (quoting *Terry v Ohio*, 392 US 1, 26 [1968])]; *People v Dillon*, 44 AD3d 1068, 1070 [2007]; *People v Rielly*, 190 AD2d 695 [1993]). The initial entry of the police into the house was justified, as the police had been summoned by the defendant's wife to aid the defendant, who had just shot himself in the hand with a gun (*see People v Thatcher*, 9 AD3d 682 [2004]). That emergency was extended when the police learned that there were children in the house, and that they might be in possession of the gun. However, once the police frisked the defendant and knew that the children did not have the gun, the emergency abated. The actions of the police in checking the children for weapons and then keeping them under their watch effectively neutralized the emergency (*see United States v Johnson*, 22 F3d 674, 680 [6th Cir 1994] [once police had freed kidnap victim, the emergency was over]). The children could not have accessed a gun and injured someone while under police supervision (*see Washington v United States*, 585 A2d 167, 170 [DC Ct App 1991] [noting that with three officers present in the defendant's bedroom and them having taken effective control over the situation, neither they nor any other persons could have been threatened by the possibility that the defendant would retrieve the gun and use it]). The evidence at the hearing was unclear as to when the officers were removing the children from the house relative to Officer Alvarado's search for the gun, but vagueness in the People's proof does not suffice to satisfy their burden of production (*see People v Berrios*, 28 NY2d 361, 367 [1971]; *People v Mena*, 269 AD2d 147, 148 [2000]; *People v Sanders*, 79 AD2d 688 [1980]). In any case, whether the children were inside the house or being removed from it at the time of Officer Alvardo's search is of no significance, since the record established that prior to his search, the children did

not possess the gun and were being supervised by the police. The children, thus, were not in danger.

The nature of the emergency exception is that there is a compelling need for police action, but no time to secure a warrant (see *Washington v Gregory*, 1998 WL 267069, *2-3, 1998 Wash App LEXIS 773, *8 [Ct App Wash, Div 2 1998]; *Washington v United States*, 585 A2d at 170). If, after neutralizing the emergency, the police wanted to continue to ensure the safety of the children while they waited for judicial authorization to search the house for the gun, they could have secured the area by stationing an officer at the scene while applying for a warrant (see *United States v Gooch*, 6 F3d 673, 680 [9th Cir 1993] [search of tent on public property that resulted in recovery of firearm was not justified under exigent circumstances, as no one remained in the tent at the time of the search, and it would not have been difficult to prevent anyone from accessing the tent until a warrant was obtained]; *United States v Goldenstein*, 456 F2d 1006, 1010 [1972], *cert denied sub nom. Ray v United States*, 416 US 943 [1974] [justifiable emergency search was made in defendant's hotel room, however, once shooter was determined not to be in room, the emergency was over; there was no reason then for the officer to search a suitcase in the room; the officer conceded that the room could have been sealed off or posted to prevent the defendant from making an entrance while a warrant was obtained]).

In addition, the People failed to satisfy the third prong of the *Mitchell* test, as there was no nexus between the area near the shed and the emergency. Whether the children were still inside the house or being moved outside it at the time of Officer Alvarado's search, they could not have accessed the gun near the shed, particularly with several officers at the scene (see *People v Rodriguez*, 77 AD3d 280, 289 [2010] [holding that police had some reasonable basis, approximating probable cause, to associate the emergency with the inside of the subject apartment]; *United States v Goldenstein*, 456 F2d at 1010 [stating that the right to search emergency doctrine would under the circumstances be no greater than the right to search incident to a lawful arrest]).

Since I conclude that the People failed to satisfy the first and third prongs of the *Mitchell* standard, I need not reach the issue of the second prong and whether the New York State Constitution requires the retention of it (see *People v Rodriguez*, 77 AD3d at 284).

Accordingly, since the People did not satisfy the requirements of the *Mitchell* standard, I would grant suppression of the gun that was recovered and order a new trial.

The defendant's contention that the jury's verdict was not supported by legally sufficient evidence is not preserved for appellate review and, in any event, is without merit. Moreover, the verdict of guilt was not against the weight of the evidence. In light of my determination, I need not address the defendant's remaining contentions.