People v Alberts (2018 NY Slip Op 03393)





People v Alberts


2018 NY Slip Op 03393


Decided on May 10, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 10, 2018

107970

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
ROBERT J. ALBERTS, Appellant.

Calendar Date: March 30, 2018

Before: McCarthy, J.P., Clark, Mulvey, Aarons and Rumsey, JJ.


Alexander W. Bloomstein, Hillsdale, for appellant.
Stephen D. Ferri, Special Prosecutor, Binghamton, for respondent.


Clark, J.

MEMORANDUM AND ORDER
Appeals (1) from a judgment of the County Court of Cortland County (Campbell, J.), rendered July 30, 2015, upon a verdict convicting defendant of the crimes of criminal possession of a controlled substance in the second degree and unlawful manufacture of methamphetamine in the third degree, and (2) from a judgment of said court, rendered December 3, 2015, which resentenced defendant.
On an evening in June 2014, David Tobias of the Cortland County Sheriff's Department drove to the home of defendant's parents to investigate a tip that methamphetamine was being manufactured at that address. During the course of his investigation, Tobias made various observations that led him to believe that defendant and his two codefendants, Terry Maricle
and Kristina Yerian, were manufacturing methamphetamine in a detached garage not far from the residence. Based on his belief that there was an active methamphetamine lab inside, Tobias twice entered the garage without a warrant, but he did not seize any evidence. The police subsequently obtained a warrant to search the garage and the residence and, upon execution of that warrant, seized various items of equipment, precursors, chemical reagents and solvents used in the manufacture of methamphetamine. Consequently, defendant was charged by indictment with criminal possession of a controlled substance in the second degree and unlawful manufacture of methamphetamine in the third degree. County Court denied defendant's subsequent motion to suppress, among other things, the items seized during the search. Defendant was thereafter jointly tried by a jury with his codefendants and ultimately convicted as [*2]charged [FN1]. County Court sentenced defendant to six years in prison and five years of postrelease supervision on the criminal possession of a controlled substance conviction and 2½ years in prison and one year of postrelease supervision on the unlawful manufacture of methamphetamine conviction, with the sentences to run concurrently [FN2]. Defendant appeals.
We affirm. Initially, we are unpersuaded by defendant's contention that his convictions are against the weight of the evidence. In a weight of the evidence review, we first assess whether, based on all of the credible evidence, a different verdict would have been unreasonable; where a different result would not have been unreasonable, we then "'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony'" to determine if the verdict is supported by the weight of the evidence (People v Romero, 7 NY3d 633, 643 [2006], quoting People v Bleakley, 69 NY2d 490, 495 [1987]; accord People v Byrd, 152 AD3d 984, 986 [2017]). As relevant here, "[a] person is guilty of criminal possession of a controlled substance in the second degree when he or she knowingly and unlawfully possesses . . . one or more preparations, compounds, mixtures or substances containing methamphetamine, its salts, isomers or salts of isomers and said preparations, compounds, mixtures or substances are of an aggregate weight of two ounces or more" (Penal Law § 220.18 [2]). As relevant here, "[a] person is guilty of unlawful manufacture of methamphetamine in the third degree when he or she possesses at the same time and location, with intent to use, or knowing that another intends to use each such product to unlawfully manufacture, prepare or produce methamphetamine[,] . . . [t]wo or more items of laboratory equipment and two or more precursors, chemical reagents or solvents in any combination" (Penal Law § 220.73 [1]).
The trial evidence established that, at some point, defendant was placed inside of Tobias' patrol vehicle, that defendant had a glass of water within the vehicle and that Tobias later discovered white pills — which he recognized as pseudoephedrine, a precursor to methamphetamine — at the bottom of the water glass and on the floor of his vehicle. The evidence also established that, upon execution of the search warrant, the police seized — from the same area within the garage — precursors (specifically, blister packs for pseudoephedrine), reagents (including drain opener, ammonium nitrate and muriatic acid), solvents (such as Coleman fuel, brake fluid and starting fluid) and equipment (namely, a pill grinder, a white pan, coffee filters, plastic tubing, a mask and glass jars) commonly used in the manufacture of methamphetamine. A state trooper involved in the search explained that the seized items, which [*3]could all be legally purchased, were typically used in the "one-pot" method of methamphetamine manufacture and that the search team had recovered two separate one-pots from the garage. The testimony demonstrated that several samples of liquid — weighing a total of roughly three ounces — were taken from the one-pots and that, although there were gaps and inconsistencies in the chain of custody, those samples ultimately tested positive for methamphetamine.
Because defendant was not found to be in physical possession of any of the seized items, the People had to establish that defendant constructively possessed the items by showing that he "exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found" (People v Manini, 79 NY2d 561, 573 [1992]; see Penal Law § 10.00 [8]; People v Carvajal, 6 NY3d 305, 327 [2005]). In that regard, the evidence established that the residence belonged to defendant's parents, and a voluntary statement given by Yerian to the police suggested that defendant resided with his parents. In addition, Tobias testified that, on the night in question, he had two encounters with defendant, separated by a 10-minute period when he left the residence and called his supervisor. Tobias stated that, on both occasions, it was defendant who emerged from the garage to meet him. Tobias also testified that, in response to his inquiries as to what he was doing inside the garage, defendant represented that he was having sex with a woman. Tobias further stated that defendant accompanied him into the garage during his first warrantless entry and that defendant protested his second warrantless entry.
It would not have been unreasonable for the jury to have acquitted defendant of both charges, as it could have found that defendant did not have dominion or control over the seized items, all of which could be plausibly found in a garage, by having a sufficient level of control over the garage (see People v Graham, 138 AD3d 1242, 1243 [2016], lv denied 28 NY3d 930 [2016]). Additionally, with respect to the criminal possession charge, the jury could have also found that, due to the gaps and inconsistencies in the chain of custody, it could not be reasonably assured of the identity of the samples allegedly taken from the one-pots and, thus, that defendant possessed the requisite amount of methamphetamine (see generally People v Beverly, 5 AD3d 862, 864 [2004], lvs denied 2 NY3d 796, 804 [2004]; People v Howard, 305 AD2d 869, 870 [2003], lv denied 100 NY2d 583 [2003]; People v Haggray, 173 AD2d 962, 964 [1991], lv denied 78 NY2d 966 [1991]). However, viewing the foregoing evidence in a neutral light and deferring to the jury's credibility determinations (see People v Ford, 156 AD3d 1242, 1244 [2017]; People v Cochran, 140 AD3d 1198, 1200 [2016], lvs denied 28 NY3d 970 [2016]), we are satisfied that defendant's convictions are not against the weight of the evidence.
Next, contrary to defendant's assertions, Tobias' warrantless entries into the garage were justified under the emergency exception to the warrant requirement. Under the Fourth Amendment of the US Constitution and article I, § 12 of the NY Constitution, warrantless entries into an individual's home are presumptively unreasonable, subject to certain carefully circumscribed exceptions (see United States v Karo, 468 US 705, 717 [1984]; People v McBride, 14 NY3d 440, 445 [2010], cert denied 562 US 931 [2010]; People v Molnar, 98 NY2d 328, 331 [2002]; People v Knapp, 52 NY2d 689, 694 [1981]). Under the NY Constitution, the emergency exception to the warrant requirement permits "the police [to] make a warrantless entry into a protected area if three prerequisites are met: '(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched'" (People v Gibson, 117 AD3d 1317, 1318 [2014], affd 24 NY3d 1125 [2015], quoting People v Mitchell, 39 NY2d 173, 177-178 [1976], cert denied 426 US 953 [1976]; see People v Molnar, 98 NY2d at 332). The [*4]Supreme Court of the United States has eliminated any consideration of subjective intent — i.e., the second prong of the New York test — from the emergency exception under the Fourth Amendment (see Brigham City v Stuart, 547 US 398, 404-405 [2006]), and the Court of Appeals has yet to address whether the second prong of the New York test remains viable in the wake of that Supreme Court determination (see People v Doll, 21 NY3d 665, 671 n [2013], cert denied ___ US ___, 134 S Ct 1552 [2014]; People v Dallas, 8 NY3d 890, 891 [2007]). Nevertheless, because we find that the warrantless entries into the garage satisfied both the federal and state standards, we need not address that question here (see People v Gibson, 117 AD3d at 1318 n 1; People v Rodriguez, 77 AD3d 280, 284 [2010], lv denied 15 NY3d 955 [2010]).
At the suppression hearing, Tobias testified that when he drove by the residence, he observed a light on in the garage and smoke emanating from a missing window pane on the garage door and that, upon pulling into the driveway, he was immediately greeted by defendant, who emerged from the garage. According to Tobias, defendant appeared "very nervous" and acted in a manner that led him to believe that defendant did not want him near the garage. Tobias also stated that, as he walked up the driveway, he smelled a strong "chemical odor" that he believed — based on his experience — to be associated with an active methamphetamine lab. Tobias testified that, after a brief encounter with defendant, he got back into his car, drove down the road and called his supervisor, who advised him to call for backup and return to the scene. According to Tobias, no more than 10 minutes had passed between his departure from and return to the residence.
Tobias testified that when he returned to the scene, he noticed that the broken window had been boarded up, but that he nonetheless continued to observe smoke and smell the strong odor. He stated that he was again greeted by defendant and that, in response to his questions about the origin of the smoke, defendant indicated that he and a woman had engaged in sexual conduct in the garage and had been smoking. Upon defendant's request, a woman, who was later determined to be Yerian, emerged from the garage. Tobias stated that he thereafter heard "shuffling" and "movement" inside the garage, prompting him to enter the garage with defendant to ensure that no one remained inside. Tobias testified that he knew methamphetamine labs to be dangerous and that he entered the garage without a warrant because he "wanted to make sure for the safety of those who were in there that they got out." According to Tobias, once inside, he observed Maricle and a plastic one-pot methamphetamine lab in plain view. Tobias stated that he escorted Maricle out of the garage and that, despite defendant's protests and insistence that he needed a warrant, he reentered the garage with a mask "to make sure [that] everybody was out of there." After concluding that no one else was in the garage, Tobias exited, without having seized any evidence. While defendant challenged the credibility of Tobias on cross-examination and during summation, he did not present any witnesses of his own. Consequently, County Court fully credited the testimony given by Tobias, and we accord great deference to that credibility determination (see People v Prochilo, 41 NY2d 759, 761 [1977]; People v Nicholas, 118 AD3d 1183, 1188 [2014], lvs denied 24 NY3d 1121, 1122 [2015]; People v Musto, 106 AD3d 1380, 1380 [2013], lv denied 21 NY3d 1007 [2013]).
Defendant argues that Tobias would not have left the scene after his initial encounter with defendant if he was truly concerned with the safety risks posed by the suspected active methamphetamine lab. Tobias testified that he remained in the area, immediately called his supervisor for direction and left the residence for no more than 10 minutes. Under the circumstances presented after Tobias' initial encounter with defendant, we are unconvinced that Tobias' brief departure from the scene negates his asserted reason for entering the garage (see generally People v Molnar, 98 NY2d at 334). In our view, Tobias' testimony established that he had objective reasonable grounds — which included his observations of continuous smoke, a [*5]strong odor that he associated with an active methamphetamine lab, defendant's suspicious behavior and misrepresentations, as well as the noises he heard from within the garage after Yerian emerged — for believing that there was an active methamphetamine lab inside the garage that posed an immediate danger to any occupants (see People v Dillon, 44 AD3d 1068, 1070 [2007]; People v Thatcher, 9 AD3d 682, 684 [2004]; People v Stagnitto, 261 AD2d 890, 891 [1999], lv denied 93 NY2d 1028 [1999]). Considering that the smoke was emanating from a window inside the garage, which was boarded up in the time between his brief departure from and return to the residence, and that both defendant and Yerian had emerged from the garage, Tobias also had a reasonable basis, approximating probable cause, to believe that an active methamphetamine lab was being operated from within the garage (see People v Dillon, 44 AD3d at 1070). Furthermore, Tobias' testimony established that his primary reason for entering the garage was not to arrest defendant or to seize evidence. Indeed, Tobias testified that, because he knew "[m]eth labs [to be] dangerous" and to pose a "risk of explosions and fires," both of his entries into the garage were motivated by his concern for the safety of anyone who may have remained inside (see id.). In view of the foregoing, we find that Tobias' warrantless entries into the garage were justified by the emergency doctrine (see People v Mitchell, 39 NY2d at 180; People v Gibson, 117 AD3d at 1321).
We also reject defendant's contention that the search warrant was not supported by probable cause. "[I]n order to establish probable cause for the issuance of a search warrant, the warrant application must demonstrate that there is 'sufficient information to support a reasonable belief that evidence of a crime may be found in a certain place'" (People v Pinkney, 90 AD3d 1313, 1315 [2011], quoting People v Church, 31 AD3d 892, 894 [2006], lv denied 7 NY3d 866 [2006]; see People v Pasco, 134 AD3d 1257, 1258 [2015]). The warrant application was supported by, among other things, the sworn deposition of Tobias, who attested to the observations that he made at the residence during his investigation of an allegedly anonymous tip that methamphetamine was being manufactured at defendant's family residence. While it was later revealed that Tobias knew the identity of the informant and that the information was the product of hearsay, Tobias' independent, firsthand observations at the scene — namely, the smoke emitting from the broken garage window, the odor associated with an active methamphetamine lab and defendant's suspicious demeanor and misrepresentations as to how many people were inside the garage, along with the fact that the broken window had been boarded up during Tobias' brief absence — constituted sufficient information to support a reasonable belief that evidence of a crime may be found in the garage and the residence (see People v Vanhoesen, 31 AD3d 805, 806 [2006]; People v Ashton, 169 AD2d 353, 355-356 [1991], appeal dismissed 79 NY2d 897 [1992]; compare People v Wirchansky, 41 NY2d 130, 132-135 [1976]). Moreover, Tobias' independent observations of smoke and a chemical odor were corroborated by the sworn deposition of a police officer who arrived at the residence in response to Tobias' request for backup. Accordingly, we find that the search warrant was issued upon probable cause (see People v Pasco, 134 AD3d at 1258; People v Pinkney, 90 AD3d at 1316).
Defendant further argues that County Court abused its discretion in denying his request for substitution of assigned counsel without first conducting an inquiry. Generally, although an indigent criminal defendant does not have the right to the "appointment of successive lawyers at [his or her] option," he or she may be entitled to substitution of assigned counsel upon a showing of good cause (People v Sides, 75 NY2d 822, 824 [1990]; see People v Washington, 25 NY3d 1091, 1095 [2015]; People v Manley, 70 AD3d 1125, 1125 [2010]). Where a defendant makes a showing of good cause, supported by "specific factual allegations of serious complaints about counsel," the trial court "must make at least a minimal inquiry, and discern meritorious complaints from disingenuous applications by inquiring as to the nature of the disagreement or its potential for resolution" (People v Porto, 16 NY3d 93, 100 [2010] [internal quotation marks [*6]and citations omitted]; see People v Sides, 75 NY2d at 825; People v Puccini, 145 AD3d 1107, 1109 [2016], lv denied 29 NY3d 1035 [2017]).
Although the record includes a March 2015 letter from County Court to defendant in which the court denies defendant's request for substitution of assigned counsel, the record does not disclose when defendant made such letter request or his reasons for doing so. Under these circumstances, we cannot evaluate whether defendant raised sufficiently serious complaints about his assigned counsel such that County Court was required to conduct a minimal inquiry. However, we note that defendant did not subsequently challenge County Court's denial of his request and that, during a pretrial conference held on the eve of trial, defendant solely raised issues with counsel's defense strategies — a complaint that does not establish good cause for substitution of assigned counsel (see People v Linares, 2 NY3d 507, 511 [2004]; People v Brown, 154 AD3d 1004, 1006 [2017], lv denied 30 NY3d 1113 [2018]; People v Bradford, 118 AD3d 1254, 1255 [2014], lv denied 24 NY3d 1082 [2014]).
Defendant's remaining arguments lack merit. With respect to his claim of ineffective assistance of counsel, a review of the record as a whole reveals that defense counsel provided defendant with meaningful representation, as he made relevant pretrial motions, registered timely evidentiary objections, ably cross-examined and impeached witnesses and gave appropriate opening and closing statements (see People v Rivers, 152 AD3d 1054, 1058 [2017], lv denied 30 NY3d 1063 [2017]; People v Malloy, 152 AD3d 968, 971 [2017], lv denied 30 NY3d 981 [2017]; People v Ramos, 133 AD3d 904, 909 [2015], lvs denied 26 NY3d 1143, 1149 [2016]). Finally, County Court properly weighed defendant's lack of criminal history and substance abuse issues against the seriousness of the crimes, and we discern no extraordinary circumstances or abuse of discretion warranting a reduction of the sentence in the interest of justice (see People v Leduc, 140 AD3d 1305, 1308 [2016], lv denied 28 NY3d 932 [2016]; People v Reynoso, 11 AD3d 719, 720 [2004]; People v Cruz, 244 AD2d 803, 804-805 [1997]).
To the extent that we have not specifically addressed any of defendant's arguments, they have been reviewed and found to be meritless.
McCarthy, J.P., Mulvey, Aarons and Rumsey, JJ., concur.
ORDERED that the judgments are affirmed.



Footnotes

Footnote 1: Maricle and Yerian were also convicted as charged. In particular, Maricle was convicted of criminal possession of a controlled substance in the second degree and unlawful manufacture of methamphetamine in the third degree, and Yerian was convicted of criminal possession of a controlled substance in the second degree. Based on legal sufficiency grounds, this Court reversed Maricle's convictions and dismissed the indictment against him (People v Maricle, 158 AD3d 984 [2018]).

Footnote 2: County Court initially imposed three years of postrelease supervision on the criminal possession conviction, but corrected that illegal sentence upon resentencing and imposed the required five-year period of postrelease supervision (see Penal Law § 70.45 [2]). On appeal, defendant does not raise any arguments with respect to the judgment of resentencing.